# Illinois Official Reports

## Supreme Court

<div style="border:1px solid black">

*Piccioli v. Board of Trustees of the Teachers' Retirement System*, 2019 IL 122905

</div>

| | |
|---|---|
| Caption in Supreme Court: | DAVID PICCIOLI, Appellant, v. THE BOARD OF TRUSTEES OF THE TEACHERS' RETIREMENT SYSTEM *et al.*, Appellees. |
| Docket No. | 122905 |
| Filed | April 4, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, the Hon. Ryan M. Cadagin, Judge, presiding. |
| Judgment | Circuit court judgment reversed; cause remanded with directions. |
| Counsel on Appeal | Esther J. Seitz, of Hinshaw & Culbertson LLP, of Springfield, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of Chicago, of counsel), for appellees. |

Justices          JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Kilbride and Neville concurred in the judgment and opinion.

Justice Theis dissented, with opinion, joined by Justices Thomas and Garman.

**OPINION**

¶ 1      Plaintiff, David Piccioli, appeals directly to this court from an order of the Sangamon County circuit court holding a 2007 amendment to the Illinois Pension Code (Code) (Pub. Act 94-1111 (eff. Feb. 27, 2007) (adding 40 ILCS 5/16-106(10))) unconstitutional and entering summary judgment in favor of defendants, the Board of Trustees of the Teachers' Retirement System (TRS) and its individual trustees. We reverse the circuit court's judgment and remand with directions to enter summary judgment in favor of plaintiff.

¶ 2                         BACKGROUND

¶ 3      On February 27, 2007, Public Act 94-1111 (eff. Feb. 27, 2007) (2007 Act) was enacted into law. Among other things, the 2007 Act added a new provision to article 16 of the Code, which governs the TRS. *Id.* (adding 40 ILCS 5/16-106(10)). This provision allowed an officer or employee of a statewide teachers' union, such as the Illinois Federation of Teachers (IFT) or the Illinois Education Association (IEA), who was a certified teacher as of the effective date of the amendment, to establish service credit in the TRS for his or her union work prior to becoming certified as a teacher.[1] *Id.* To obtain this benefit, an individual had to meet three requirements: (1) be certified as a teacher on or before the effective date of the legislation (*i.e.*, Feb. 27, 2007), (2) apply in writing to the TRS within six months after the effective date of the legislation, and (3) pay into the system both the employee contribution and employer (State) contribution, plus interest, for his or her prior union service. *Id.*

¶ 4      According to the legislative debates, the goal of the 2007 amendment was to allow employees of teachers' unions to "pick up their service" in the TRS for the period during which they worked for the union *prior to* becoming certified as a teacher. 94th Ill. Gen. Assem., House Proceedings, Nov. 28, 2006, at 68-69 (statements of Representative Hannig); 94th Ill. Gen. Assem., Senate Proceedings, Nov. 30, 2006, at 50 (statements of Senator Martinez).

¶ 5      Plaintiff worked as a lobbyist for the IFT from 1997 until his retirement on December 31, 2012. In December 2006, plaintiff obtained a substitute teaching certificate. On January 22, 2007, he worked for one day as a substitute teacher in the Springfield public schools. By taking these steps, plaintiff met the statutory criteria to qualify as a certified teacher prior to February 27, 2007, the effective date of the 2007 amendment. 105 ILCS 5/21-9 (West 2006); 40 ILCS

---

[1]The 2007 Act also amended the Code to allow officers or employees of state employee unions who had previously earned creditable service in the State Employees' Retirement System of Illinois (SERS) to purchase service credit in that system for both their prior union service and their union service going forward. See Pub. Act 94-1111, § 5 (eff. Feb. 27, 2007) (adding 40 ILCS 5/14-103.05(c)). These provisions have not been altered and are still part of the Code.

5/16-106(10) (West 2006). Within six months of that date, plaintiff applied in writing to the TRS. On June 1, 2007, plaintiff officially became a member of the TRS. Plaintiff then contributed $192,668 to the system for his union service during the period from 1997 through May 31, 2007.[2] It is undisputed that plaintiff complied with all of the statutory requirements for obtaining service credit in the TRS for his union service prior to becoming a certified teacher.

¶ 6    In October 2011, the Chicago Tribune published an article and editorial which identified plaintiff by name and criticized the law that allowed him to become a member of the TRS and qualify for a teacher's pension. In response to the negative media coverage, Public Act 97-651 (eff. Jan. 5, 2012) (2012 Act) was enacted into law on January 5, 2012. Among other things, the 2012 Act repealed the 2007 amendment at issue in this case. *Id.* §§ 5, 97 (amending 40 ILCS 5/16-106(10)). The 2012 Act stated, in part:

> "Retroactive repeal. This amendatory Act *** hereby repeals and declares void *ab initio* the last paragraph of Section 16-106 of the Illinois Pension Code as contained in Public Act 94-1111 as that paragraph furnishes no vested rights because it violates multiple provisions of the 1970 Illinois Constitution, including, but not limited to, Article VIII, Section 1 [(Ill. Const. 1970, art. VIII, § 1) ('Public funds, property or credit shall be used only for public purposes.')]." *Id.* § 97.

¶ 7    The repeal provision also provided for a refund of contributions to employees who had qualified for benefits pursuant to the 2007 amendment. The provision stated:

> "Upon receipt of an application within 6 months after the effective date of this amendatory Act of the 97th General Assembly, the System shall immediately refund any contributions made by or on behalf of a person to receive service credit pursuant to the text set forth in Public Act 94-1111, as well as any amount determined by the Board to be equal to the investment earned by the System on those contributions since their receipt." *Id.*

¶ 8    Pursuant to the 2012 Act, the TRS eliminated the service credits plaintiff had received for his union service from 1997 through May 31, 2007, and issued a refund of his contributions. Thereafter, plaintiff filed a complaint against defendants in the circuit court. Plaintiff sought injunctive relief and a declaratory judgment that the retroactive repeal of the 2007 amendment violated several provisions of the state constitution, including the pension protection clause (Ill. Const. 1970, art. XIII, § 5). The parties filed cross-motions for summary judgment. In their motion, defendants argued for the first time that the 2007 amendment was unconstitutional special legislation (Ill. Const. 1970, art. IV, § 13) and, therefore, that the 2012 Act repealing that provision was constitutionally valid.

¶ 9    The trial court agreed with defendants' argument and entered summary judgment for defendants and against plaintiff. The court first rejected plaintiff's claim that defendants lacked standing to attack the constitutionality of the 2007 amendment. The court then held that the effective-date cutoff in the 2007 amendment, which limited benefits to employees who met the eligibility criteria as of the effective date of the legislation, rendered that provision special

---

[2]Plaintiff also contributed approximately $172,000 to the TRS for his ongoing union service from June 1, 2007, to December 31, 2012, pursuant to section 16-106(8) of the Code (40 ILCS 5/16-106(8) (West 2006)). Plaintiff's service credit for this time period is not at issue in this appeal.

legislation. Accordingly, the court declared the provision unconstitutional and void *ab initio*. Plaintiff appealed the trial court's decision directly to this court. Ill. S. Ct. R. 302(a)(1) (eff. Oct. 4, 2011).

¶ 10                                                    ANALYSIS
¶ 11                                                  I. Standing
¶ 12         Plaintiff first contends that defendants lack standing to attack the constitutionality of the 2007 amendment. The doctrine of standing ensures that courts decide actual controversies and not abstract questions. *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 328 (1997) (citing *In re Marriage of Rodriguez*, 131 Ill. 2d 273, 279-80 (1989)). Under Illinois law, standing requires "some injury in fact to a legally cognizable interest." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492 (1988). "To have standing to challenge the constitutionality of a statute, *** one must have sustained or be in immediate danger of sustaining a direct injury as a result of enforcement of the challenged statute." *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 23 (2004). "The claimed injury must be (1) distinct and palpable; (2) fairly traceable to defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." *Chicago Teachers' Union, Local 1 v. Board of Education of the City of Chicago*, 189 Ill. 2d 200, 207 (2000) (citing *Glisson v. City of Marion*, 188 Ill. 2d 211, 221 (1999)). Questions of standing are reviewed *de novo*. *Wexler*, 211 Ill. 2d at 23.

¶ 13         As he did in the circuit court, plaintiff argues that defendants have no personal interest in the controversy because they are in no danger of suffering an injury to their personal rights. Plaintiff maintains that the TRS is merely a fiduciary for the benefit of its members and, thus, has no personal interest in the fund it administers. Accordingly, plaintiff argues, defendants "lack[ ] power to unilaterally attack the 2007 Act's constitutionality." We agree with the circuit court that plaintiff's standing argument is without merit.

¶ 14         Defendants are not seeking judicial redress for any alleged violations of their personal rights. The party seeking judicial review and enforcement in this case is plaintiff, not defendants. In arguing that the 2007 amendment is unconstitutional, defendants are simply defending the constitutionality of the 2012 Act and the actions they took pursuant to that legislation. Defendants complied with the 2007 Act by allowing plaintiff to join the TRS as a member and make contributions for his past union service. Defendants then complied with the 2012 Act by voiding plaintiff's service credits and refunding his contributions. Defendants have the right to defend the validity of the 2012 Act by virtue of the fact that plaintiff has filed a lawsuit against them seeking a declaratory judgment that the enactment is unconstitutional. Thus, we reject plaintiff's argument that defendants lack standing to challenge the constitutionality of the 2007 amendment.

¶ 15                                             II. Special Legislation
¶ 16         We now turn to the central issue raised in this appeal. The question before this court is whether the 2007 amendment to section 16-106(10) of the Code is special legislation in violation of the state constitution. Our answer to this question will dictate whether the 2012 Act, which repealed the 2007 amendment and required that beneficiaries have their benefits

revoked and their contributions refunded, violated the pension protection clause (Ill. Const. 1970, art. XIII, § 5).

¶ 17       The constitutionality of a statute is a question of law subject to *de novo* review. *Board of Education of Peoria School District No. 150 v. Peoria Federation of Support Staff, Security/Policeman's Benevolent & Protective Ass'n Unit No. 114*, 2013 IL 114853, ¶ 41. Statutes carry a strong presumption of constitutionality. *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 16. It is this court's duty to uphold the constitutionality of a statute if reasonably possible. *Id.* As the party alleging that the 2007 amendment is unconstitutional, defendants bear the burden of establishing the statute's constitutional infirmity. *Id.*

¶ 18       Special legislation is expressly prohibited by our state constitution: "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13. "The special legislation clause prohibits the General Assembly from conferring a special benefit or privilege upon one person or group and excluding others that are similarly situated." *Crusius v. Illinois Gaming Board*, 216 Ill. 2d 315, 325 (2005). The clause prevents the legislature from making classifications that arbitrarily discriminate in favor of a select group. *Id.* To determine whether a law constitutes special legislation, we apply a two-part test. First, we must decide whether the statutory classification at issue discriminates in favor of a select group and against a similarly situated group. Second, if the classification does so discriminate, we must determine whether the classification is arbitrary. *Id.*; *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 235 (2005).

¶ 19       There is no question that the 2007 amendment discriminates in favor of employees who began working for statewide teachers' unions prior to its effective date and discriminates against employees who began after that date. The 2007 amendment creates a cutoff date whereby those individuals who were not employed by one of the unions on or before February 27, 2007, were excluded from availing themselves of the benefits in the statute. In addition, the amendment distinguishes between employees of statewide teachers' unions who were certified as teachers on or before the effective date and those who were not, and it confers a benefit on the former that is unavailable to the latter. See Pub. Act 94-1111 (eff. Feb. 27, 2007) (amending 40 ILCS 5/16-106(10)) (restricting benefit to an officer or employee of a statewide teachers' union who was "certified as a teacher on or before the effective date of this amendatory Act"); see also *Crusius*, 216 Ill. 2d at 325-26. However, the existence of a cutoff date in the statute does not necessarily render the law unconstitutional. Under the second step of the special legislation analysis, we must consider whether the classification created by the cutoff date is arbitrary. *Id.* at 325.

¶ 20       Whether a classification is arbitrary is generally determined under the same standards that are applicable to an equal protection challenge. *Moline School District No. 40 Board of Education*, 2016 IL 119704, ¶ 24. Where, as here, a statute does not affect fundamental rights, we use the rational basis test to assess its constitutionality. *Id.* Under this test, we ask whether the statutory classification is rationally related to a legitimate state interest. *Id.* The classification does not need to be supported by evidence or empirical data. *Big Sky Excavating, Inc.*, 217 Ill. 2d at 240. In determining whether a statute satisfies the rational basis standard, a

court does not engage in "courtroom fact finding." *People ex rel. Lumpkin v. Cassidy*, 184 Ill. 2d 117, 124 (1998). "Under the rational basis test, *the court may hypothesize reasons for the legislation, even if the reasoning advanced did not motivate the legislative action*. [Citation.] If there is any conceivable basis for finding a rational relationship, the law will be upheld." (Emphasis added.) *Id.* Moreover, the fact that a law may be ill-conceived does not create a constitutional problem for the courts to fix. *Moline School District No. 40 Board of Education*, 2016 IL 119704, ¶ 28. "[W]hether a statute is wise and whether it is the best means to achieve the desired result are matters for the legislature, not the courts." *Id.* (citing *Crusius*, 216 Ill. 2d at 332).

¶ 21 The inclusion of a cutoff date in a statute, especially a statute that confers benefits or establishes a government program reliant on public funding, is entirely rational. Since state and local governments operate with limited resources and budgets, restricting benefits to a finite number of participants is not only reasonable but necessary. Advancement of the State's economic goals clearly is a legitimate rationale for legislation. See *Crusius*, 216 Ill. 2d at 327 (holding that promotion of the State's economic goals is a reasonable legislative objective that withstands a special legislation attack); *Moline School District No. 40 Board of Education*, 2016 IL 119704, ¶ 27; *Jacobson v. Department of Public Aid*, 269 Ill. App. 3d 359, 368-69 (1994).

¶ 22 Under the circumstances in this case, the legislature reasonably could have chosen to impose a cutoff date for the purpose of budgetary responsibility and preservation of the State's pension funds. It certainly is not unusual for the legislature to make pension benefits contingent upon an individual's eligibility as of the statute's effective date. See, *e.g.*, Pub. Act 97-651 (eff. Jan. 5, 2012) (amending 40 ILCS 5/16-106(8)) (allowing a teachers' union employee to establish service credit in the TRS for future union service if "the individual first became an officer or employee of the teacher organization and becomes a member before the effective date of this amendatory Act of the 97th General Assembly"); Pub. Act 96-889 (eff. Apr. 14, 2010) (establishing "Tier 1" annuity benefits for persons who became members of public retirement systems prior to January 1, 2011, and "Tier 2" annuity benefits for persons who became members on or after January 1, 2011). Accordingly, we find that the cutoff date in the 2007 amendment was rationally related to a legitimate government interest in offering pension benefits to current employees while, at the same time, containing costs by excluding future employees from those benefits.

¶ 23 Moreover, even if the 2007 amendment were totally revenue-neutral, that is, it neither imposed costs on the State nor saved the State any money, it would still survive constitutional scrutiny. It is perfectly reasonable for the legislature to include a cutoff date in a statute establishing a public program or benefit. We are aware of no constitutional rule that requires a government program to continue in perpetuity. Nor does the failure of a statute to extend particular benefits to all eligible employees, for all time, render the law unconstitutional. In order to satisfy the rational basis standard, a statutory classification requires "[n]either perfection nor mathematical nicety." *Maddux v. Blagojevich*, 233 Ill. 2d 508, 547 (2009). The mere fact that a law could have gone further than it did does not offend rational basis. *Id.*; see also *Chicago National League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 372 (1985) ("Classifications are not required to be precise, accurate or harmonious so long as they accomplish the legislative purpose."). In general, there is nothing arbitrary about using a cutoff date to limit benefits to a finite number of individuals. Therefore, since a rational reason for

the classification in the statute is conceivable, it is not special legislation. See *Big Sky Excavating, Inc.*, 217 Ill. 2d at 240.

¶ 24   Despite the foregoing, defendants nevertheless contend that the 2007 amendment is special legislation. Defendants make three arguments. First, they contend that numerous IEA employees were unaware of the 2007 amendment until after it was passed. According to defendants, these employees were unfairly deprived of the opportunity to participate in the benefits, and therefore, the statute is special legislation. We reject this contention.

¶ 25   An individual's knowledge or ignorance of a law has no relevance to whether it is special legislation. "[I]t is well settled that '[a]ll citizens are presumptively charged with knowledge of the law.' " *People v. Boclair*, 202 Ill. 2d 89, 104 (2002) (quoting *Atkins v. Parker*, 472 U.S. 115, 130 (1985)).[3] On its face, the 2007 amendment made the benefit available to any current employee who met its criteria on or before the effective date. There was nothing preventing eligible employees from doing exactly what plaintiff did, *i.e.*, obtain a substitute teaching certificate for purposes of attaining TRS membership and purchasing credits for past union service. The same benefit available to plaintiff was available to other employees. They simply chose not to avail themselves of it. The fact that an employee does not choose to opt in to a particular benefit by the deadline does not, in some way, render the statutory benefit special legislation.

¶ 26   Defendants raise a second argument that the cutoff date was arbitrary, *i.e.*, not rationally related to a legitimate government interest. According to defendants, fiscal responsibility was not the legislature's actual reason for including the cutoff date. Defendants point to two comments from the legislative debates indicating that the 2007 amendment would not impose any additional costs on the State. See 94th Ill. Gen. Assem., House Proceedings, Nov. 28, 2006, at 68 (statements of Representative Hannig) (stating that no part of the legislation would "cost the State of Illinois any additional pension moneys"); 94th Ill. Gen. Assem., Senate Proceedings, November 30, 2006, at 51 (statements of Senator Martinez) (stating that the bill "does not have any unfunded liability"). Based on these two statements, defendants conclude that the cutoff date in the statute could not further the goal of fiscal responsibility, since the statutory benefit was not going to cost the State any money to begin with. Therefore, according to defendants, the classification created by the cutoff date is arbitrary. We also reject this argument.

¶ 27   There is no evidence that the legislators' two comments that the bill would not cost the State any money are accurate. In fact, defendants' contention that the bill was revenue-neutral is highly dubious, given the critical media coverage of the 2007 amendment and the legislature's decision to repeal the amendment in response to that criticism. As we noted, however, even if it is true that the statute is revenue-neutral, the legislature does not need a special reason to cut off government benefits or programs by a certain date.

¶ 28   Finally, defendants argue that the analysis in *Peoria School District*, 2013 IL 114853, is controlling. That case is factually distinguishable and, thus, has no bearing on our decision in

---

[3]In response to defendants' argument, plaintiff has filed a motion to take judicial notice of a legislative record that purportedly indicates that the IEA was, in fact, aware of the 2007 legislation before its passage. That motion is denied. See *Rural Electric Convenience Cooperative Co. v. Illinois Commerce Comm'n*, 118 Ill. App. 3d 647, 652 (1983) (declining to take judicial notice of an irrelevant exhibit).

this case. The statutory amendment at issue in *Peoria School District* changed the laws governing labor disputes for "peace officers employed by a school district in its own police department in existence on the effective date of this amendatory Act of the 96th General Assembly" (Pub. Act 96-1257 (eff. July 23, 2010) (amending 5 ILCS 315/3 (West 2010))). *Peoria School District*, 2013 IL 114853, ¶ 7. The district challenged the amendment as special legislation because, as of the effective date of the amendment, Peoria School District No. 150 was the only school district that employed peace officers in its own police department. *Id.* ¶ 10. This court held that there was no rational justification for applying one set of laws to a school district currently employing peace officers in its own police department and applying a different set of laws to school districts that may do so in the future. *Id.* ¶¶ 59-60. Since there was no rational justification for limiting the reach of the statute to one particular school district, we held the amendment violated the special legislation clause. *Id.* ¶ 60.

¶ 29    Defendants contend that the cutoff date provision in *Peoria School District* is no different from the cutoff date in the 2007 amendment. Accordingly, defendants argue, our analysis in this case is subject to the same general principle set forth in that case:

"[A] law the legislature considers appropriately applied to a generic class presently existing, with attributes that are in no sense unique or unlikely of repetition in the future, cannot rationally, and hence constitutionally, be limited of application by a date restriction that closes the class as of the statute's effective date. Barring some viable rationale for doing so, it would, for example, violate the proscription of the constitution for the legislature to apply a law to a person or entity in existence on the effective date of enactment, but make it inapplicable to a person or entity who assumed those attributes or characteristics the day after the statute's effective date." *Id.* ¶ 54.

¶ 30    We reject defendants' argument for the simple reason that the "cutoff date" in *Peoria School District* bears no relevant similarities to the "cutoff date" in the case at bar. The cutoff date in that case was a descriptor, clearly intended to target one specific school district that, at the time, was involved in a labor dispute with its peace officers. See *id.* ¶ 10 (complaint alleged that legislators knew, when they passed the amendment, that it would only apply to that district); see also *Crusius*, 216 Ill. 2d at 325-26 (statute discriminated in favor of "licensees that were 'not conducting riverboat gambling on January 1, 1998' (230 ILCS 10/11.2(a) (West 2000))," of which Emerald Casino, Inc., was the only one). By contrast, the "cutoff date" in the 2007 amendment was simply a deadline that employees were required to meet in order to establish eligibility for a particular pension benefit. On its face, the 2007 amendment applied generally to all eligible employees who met its criteria. It was not directed at a specific individual. Moreover, the statute in *Peoria School District* did not involve a government program or benefit, which, as we have explained, is not constitutionally required to exist in perpetuity for all future applicants. Accordingly, the analysis in that case does not apply.

¶ 31                                    III. Pension Protection Clause

¶ 32    Since the 2007 amendment is not special legislation and the circuit court did not invalidate the law on any other constitutional grounds, we hold that it confers a pension benefit protected by our state constitution. See Ill. Const. 1970, art. XIII, § 5 ("Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of

which shall not be diminished or impaired."). Plaintiff followed everything the law required in order to establish his eligibility to purchase TRS credit for his past union service. While nothing prevented the legislature from eliminating this benefit for future employees, there is no legal justification for reducing or eliminating the pension benefits plaintiff was awarded pursuant to the 2007 amendment. See *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund*, 2018 IL 122793 ¶ 26 (pursuant to the pension clause, "once a person commences to work and becomes a member of a public retirement system, any subsequent changes to the Pension Code that would diminish the benefits conferred by membership in the retirement system cannot be applied to that person"). We hold that the provision in the 2012 Act (Pub. Act 97-651 (eff. Jan. 5, 2012)) that repealed the 2007 amendment violates the pension protection clause in the Illinois Constitution and, therefore, that plaintiff is entitled to summary judgment.

¶ 33                                    CONCLUSION

¶ 34        For the foregoing reasons, we reverse the decision of the circuit court declaring the 2007 amendment to section 16-106 of the Code (Pub. Act 94-1111 (eff. Feb. 27, 2007) (adding 40 ILCS 5/16-106(10))) unconstitutional and granting summary judgment to defendants. We remand the cause to the circuit court with directions to enter summary judgment in favor of plaintiff.

¶ 35        Circuit court judgment reversed; cause remanded with directions.

¶ 36        JUSTICE THEIS, dissenting:

¶ 37        I agree with the majority that plaintiff David Piccioli's standing argument lacks merit. I disagree with the majority that Piccioli's pension protection clause argument has merit. In my view, the 2007 amendment to section 16-108(10) of the Pension Code (Pub. Act 94-1111 (eff. Feb. 27, 2007) (adding 40 ILCS 5/16-106(10))) violates the special legislation clause (Ill. Const. 1970, art. IV, § 13). Consequently, the 2012 Act (Pub. Act 97-651 (eff. Jan. 5, 2012) (amending 40 ILCS 5/16-106(10))), which repealed the 2007 amendment, does not violate the pension protection clause (Ill. Const. 1970, art. XIII, § 5).

¶ 38        As Piccioli's attorney admitted at oral argument, the optics created by the facts of this case are not great. The majority's background, however, whitewashes those facts. For context, I offer details that the majority overlooks.

¶ 39        Administrators, teachers, and other staffers who work in public schools outside Chicago participate in the Teachers' Retirement System (TRS), which was established and is governed by article 16 of the Code. See 40 ILCS 5/16-101 *et seq.* (West 2016). Before 2007, article 16's definition of "teacher" included officers or employees of statewide teacher organizations who had "previously established creditable service" by teaching and who elected to become TRS members. See 40 ILCS 5/16-106(8) (West 2006). That provision allowed former teachers who later worked for teacher organizations to earn TRS service credit for their union work. There are two statewide teacher organizations in Illinois—the Illinois Federation of Teachers (IFT) and the Illinois Education Association (IEA).

¶ 40        In the 94th General Assembly, Senate Bill 36 concerned the Illinois Municipal Retirement Fund and early retirement benefits. Final Legislative Synopsis and Digest of the 94th Ill. Gen.

Assem. (No. 13), at 41, ftp://12.43.67.2/Digest/94thFinalDigest.pdf. The bill was introduced on January 26, 2005; it was approved by the Senate and sent to the House on March 2, 2005. *Id.* at 42. There, it was referred to the rules committee and then assigned to the executive committee. *Id.* The bill was re-referred to the rules committee and then assigned to the veterans affairs committee. *Id.* at 42-43. The bill was again re-referred to the rules committee, where it stalled. *Id.* at 43.

¶ 41 The record here contains the discovery deposition of Steven Preckwinkle, the IFT's director of political activities. Preckwinkle stated that, shortly after the 2006 general election, he was approached by a House Democratic staff member who asked if the organization would be interested in reviving a new version of the bill. Preckwinkle discussed that version with the IFT's president, who expressed concerns about its cost to taxpayers and its potential for "damaging exposure" if the organization supported it. Ultimately, the organization decided to do so. Preckwinkle admitted that he saw draft language for the bill, but he could not remember if anyone at the IFT was involved in writing that language. He added:

> "I don't think anybody in the IFT wrote the words of the amendment. I'm fairly certain of that. I certainly don't recall that. I think I would have remembered some discussion about it.
>
> We did have a lobbyist that worked on pension *** matters and whether or not he had some involvement, possibly had worked with a legislative staffer *** on it[,] I don't know."

¶ 42 The record also contains an e-mail from that pension lobbyist, the IFT's legislative director, Nick Yelverton, to a Legislative Reference Bureau (LRB) attorney. The e-mail was dated October 19, 2006, and the subject was "1st one is wrong." Attached to the e-mail was a document titled "IFT-TRS draft lang 10-18-06" that featured a cut-and-paste of section 16-106 of the Code from the General Assembly's website and an underlined paragraph appended to subsection (8). The paragraph stated that teacher organization employees could establish TRS service credit for their prior union work if they became certified as teachers before the legislation went into effect and paid contributions required for such credit. One minute later, Yelverton sent an e-mail to Preckwinkle with the subject "Language to LRB." That e-mail included the same attachment as the e-mail to the LRB attorney.

¶ 43 On November 9, 2006, Preckwinkle sent an e-mail to approximately 40 IFT employees who were "not currently participating in a public pension system like TRS." Preckwinkle informed them that he had scheduled two meetings concerning "individuals' rights under the law" to participate in TRS. At the meetings, Preckwinkle and Yelverton would review "rights currently provided by law as well as other related pending legislation that may be considered in the upcoming veto session." Preckwinkle noted, "If you received this e-mail it is believed you likely fall in to this category of employee." He advised that "*Persons who should attend one of these meetings are those with a bachelor's degree (or higher) or the interest in obtaining one while employed by the IFT.*" (Emphasis in original.)

¶ 44 Piccioli was a House Democratic staffer between 1987 and 1997, after which he took a position as a legislative lobbyist for the IFT. His supervisor was Preckwinkle. Piccioli received Preckwinkle's e-mail and attended one of the meetings.

¶ 45 On November 15, 2006, the House extended the final action deadline for Senate Bill 36, and it was referred to the personnel and pensions committee. The following day, that

committee scrapped the entire bill and replaced everything after the enacting clause. As rewritten, the bill included the substance of the IFT's paragraph. The bill proposed that teacher organization employees could establish TRS service credit for their prior union work if they met the definition of "teacher" in section 16-106(8) of the Code (40 ILCS 5/16-106(8) (West 2006)) and satisfied three additional conditions: (1) they became certified as teachers before the legislation went into effect, (2) they applied in writing to the TRS within six months of the legislation's effective date, and (3) they paid the TRS contributions equal to "the normal costs calculated from the date of first full-time employment" for the union, plus interest. 94th Ill. Gen. Assem., Senate Bill 36, 2006 Sess. The definition of "teacher" required "previously established creditable service" (40 ILCS 5/16-106(8)(i) (West 2006)), which included work as a substitute (*id.* § 16-130(c)). At the time, certification as a substitute teacher necessitated only a bachelor's degree. 105 ILCS 5/21-9 (West 2006). A pension note from the Commission on Government Forecasting and Accountability stated, "The fiscal impact of allowing certified teachers to upgrade periods of service in a non-certified capacity in TRS while employed by a statewide teachers' union cannot be calculated, but is expected to be minor." Final Legislative Synopsis and Digest of the 94th Ill. Gen. Assem. (No. 13), at 42, ftp://12.43.67.2/Digest/94th FinalDigest.pdf.

¶ 46    On November 28, 2006, the House approved the bill. The next day, Preckwinkle sent an e-mail to IFT employees:

> "Please note that the legislation I referred to in our recent pension meetings *** passed the House last night ***. It is now in the Senate where a vote is expected tomorrow afternoon. *** [I]t appears headed for final passage. After that, approval by the Governor could take place anytime within the next 90 days. I want to reiterate that the TRS retroactivity section of the bill will *only* apply to those who have established TRS service credit on the date the bill is signed by the [G]overnor." (Emphasis in original.)

On November 30, 2006, the Senate approved the bill. That day, Preckwinkle sent another e-mail to IFT employees:

> "Please be advised that [Senate Bill] 36 passed the Senate today and will be sent to the Governor. I will do what I can to slow down the bill signing process to allow for everyone who wishes to participate in the TRS provisions the opportunity to do so. If things go well on that end, the effective date could be as late as mid-February, but there is really no way to know that for sure."

And in a January 10, 2007, e-mail, Preckwinkle provided an update:

> "[Senate Bill] 36 was sent to the [G]overnor on December 29, 2006. He has a maximum of 60 days from that date to sign it. At this time I need to know who is in the pipeline for completing a substitute teaching assignment, your status, and when you expect to satisfy the requirements of the bill. I will try to ensure that anyone who wishes to get coverage under this legislation has enough time to do so prior to his signature."

¶ 47    Preckwinkle became certified as a substitute teacher on November 2, 2006, because he was "interested in becoming a member of TRS." Preckwinkle worked as a substitute teacher for one day. Piccioli became certified as a substitute teacher on December 8, 2006. On January 22, 2007, he worked as a substitute teacher in a Springfield elementary school. He never worked as a teacher again.

¶ 48    On February 27, 2007, exactly 90 days after the bill passed both houses, Governor Blagojevich signed Public Act 94-1111, which became effective immediately. See Pub. Act 94-1111 (eff. Feb. 27, 2007) (amending, *inter alia*, 40 ILCS 5/16-106(10)). According to TRS manager Scott Hepperly, both Piccioli and Preckwinkle submitted applications to obtain retroactive service credit for their union work. Preckwinkle was satisfied with a TRS pension from the date of his substitute teaching through his retirement. Only Piccioli made the required contributions for past credit. He paid $192,668 in installments over four years.

¶ 49    In late 2011, the Chicago Tribune published an article about Piccioli and Preckwinkle and their TRS pensions. Ray Long & Jason Grotto, *2 Teachers Union Lobbyists Teach for a Day to Qualify for Hefty Pensions*, Chi. Trib., Oct. 22, 2011, https://www.chicagotribune.com/news/ct-met-pensions-teacher-perk-20111023-story.html [https://perma.cc/79EP-BFFV?type=image]. That story, part of an ongoing investigation by the Tribune and WGN-TV, raised public awareness of union employees receiving public pensions for private sector work. The General Assembly responded with a House bill to roll back a variety of Pension Code provisions. See 97th Ill. Gen. Assem., House Proceedings, Nov. 29, 2011, at 38 (statements of Representative Cross) ("We are attempting, in this Bill, to address a variety of problems that came about as a result of some news articles ***.").

¶ 50    In 2012, Governor Quinn signed the bill as Public Act 97-651 (eff. Jan. 5, 2012). One part of the 2012 Act directly addressed the 2007 amendment to section 16-106(10):

> "This amendatory Act of the 97th General Assembly hereby repeals and declares void ab initio the last paragraph of Section 16-106 of the Illinois Pension Code as contained in Public Act 94-1111 as that paragraph furnishes no vested rights because it violates multiple provisions of the 1970 Illinois Constitution, including, but not limited to, Article VIII, Section 1. Upon receipt of an application within 6 months after the effective date of this amendatory Act of the 97th General Assembly, the System shall immediately refund any contributions made by or on behalf of a person to receive service credit pursuant to the text set forth in Public Act 94-1111, as well as any amount determined by the Board to be equal to the investment earned by the System on those contributions since their receipt." *Id.*[4]

¶ 51    The posture of this case is unique in that both parties contest the constitutionality of different statutes. Piccioli's main argument is that the 2012 Act is unconstitutional and violative of the pension protection clause because the 2007 amendment to section 16-106(10) is constitutional and not violative of the special legislation clause. The main argument by TRS is that the 2012 Act is constitutional and not violative of the pension protection clause because the 2007 amendment is unconstitutional and violative of the special legislation clause. Both arguments hinge on whether the 2007 amendment passes constitutional muster.

¶ 52    Article IV, section 13, of the Illinois Constitution provides, "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13. That section, the so-called special legislation clause, has deep roots in our jurisprudence. *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704,

---

[4]The constitutionality of other parts of Public Act 97-651 was addressed in *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund*, 2018 IL 122793.

¶ 19. The special legislation clause is grounded on "the conviction that governments should establish and enforce general principles applicable to all their citizens and not enrich particular classes of individuals at the expense of others." *Id.* (citing *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 391-92 (1997)). A general law applies to all persons and entities in the same situation; a special law does not. See *Board of Education of Peoria School District No. 150 v. Peoria Federation of Support Staff, Security/Policeman's Benevolent & Protective Ass'n Unit No. 114*, 2013 IL 114853, ¶ 48 (*Peoria School District*).

¶ 53     When a statute is challenged under the special legislation clause, our analysis is twofold. Initially, we must determine whether the classification created by the statute discriminates in favor of a certain person or group. *Moline School District*, 2016 IL 119704, ¶ 23. If so, we must determine whether the classification was arbitrary. *Id.*

¶ 54     The classification created by the 2007 amendment to section 16-106(10) satisfies the first step of the analysis. The majority concludes, "There is no question that the 2007 amendment discriminates in favor of employees who began working for statewide teachers' unions prior to its effective date and discriminates against employees who began after that date." *Supra* ¶ 19. In fact, the amendment did more than that. It discriminated in favor of teacher organization employees who were not previously TRS members, but who became certified as teachers and established creditable service before the legislation went into effect, and against teacher organization employees who were not previously TRS members, and who did not become certified as teachers and establish creditable service before the legislation went into effect. The question then becomes whether the classification—*i.e.*, the effective date cutoff— satisfies the second step.

¶ 55     The hallmark of a statutory classification that violates the special legislation clause is its arbitrariness. *Allen v. Woodfield Chevrolet, Inc.*, 208 Ill. 2d 12, 28-29 (2003) (citing *Best*, 179 Ill. 2d at 396); *In re Petition of the Village of Vernon Hills*, 168 Ill. 2d 117, 122 (1995); *Cutinello v. Whitley*, 161 Ill. 2d 409, 417 (1994). We have noted repeatedly that the second step of the special legislation analysis tracks the analysis for equal protection challenges. See *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 237 (2005). Where the classification does not impact a fundamental right or a suspect class, we review it under the rational basis test. *Crusius v. Illinois Gaming Board*, 216 Ill. 2d 315, 325 (2005). Under that test, a classification passes constitutional muster if it is rationally related to a legitimate government interest. *Id.* Stated differently, a statutory classification violates the special legislation clause when it is not based upon reasonable differences in kind or situation that are sufficiently related to the problem targeted by the statute. *Grasse v. Dealer's Transport Co.*, 412 Ill. 179, 195 (1952); *In re Belmont Fire Protection District*, 111 Ill. 2d 373, 380 (1986). The rational basis test is deferential to the findings of the legislature, but it is not toothless. *People v. Jones*, 223 Ill. 2d 569, 596 (2006) (citing *Mathews v. De Castro*, 429 U.S. 181, 185 (1976)).

¶ 56     The threshold inquiry is to identify a legitimate government interest animating the statute. We can only decide that the means chosen by the legislature are rationally related to the end pursued by the legislature if we know the end. *People v. Johnson*, 225 Ill. 2d 573, 584 (2007) ("Under the rational basis test, *** we must determine whether there is a legitimate state interest behind the legislation, and if so, whether there is a reasonable relationship between that interest and the means the legislature has chosen to pursue it.").

¶ 57     Piccioli suggests that the 2007 amendment was designed to "protect[ ] TRS'[s] fisc" because it limits "those who qualify to receive annuities from TRS'[s] finite funds." In support of his theory, Piccioli points to the pension funding crisis documented in *In re Pension Reform Litigation*, 2015 IL 118585. The majority follows his lead, positing that there is "a legitimate government interest in offering pension benefits to current employees while, at the same time, containing costs by excluding future employees from those benefits." *Supra* ¶ 22. From there, the majority backs into a rational relation between that interest and the cutoff:

> "The inclusion of a cutoff date in a statute, especially a statute that confers benefits or establishes a government program reliant on public funding, is entirely rational. Since state and local governments operate with limited resources and budgets, restricting benefits to a finite number of participants is not only reasonable but necessary." *Supra* ¶ 21.

The majority concludes that the legislature "reasonably could have chosen to impose a cutoff date for the purpose of budgetary responsibility and preservation of the State's pension funds." *Supra* ¶ 22.

¶ 58     The legislature certainly could have chosen to do so for that purpose. Here, it did not. The majority even acknowledges that the purpose of the 2007 amendment to section 16-106(10), as expressed in the legislative debates, was to allow teacher organization employees to purchase TRS service credit for their union work. *Supra* ¶ 4.

¶ 59     Representative Hannig, a sponsor of the bill that included what became the 2007 amendment, described it to the House. He stated that the bill "does several things, none of which will cost the State of Illinois any additional pension moneys." 94th Ill. Gen. Assem., House Proceedings, Nov. 28, 2006, at 68 (statements of Representative Hannig). That was because former state employees "would be required to *** put in the full amount of the cost." *Id.* at 76. Regarding article 16, he observed that the bill

> "provides a window for people who in the Teachers['] Retirement System who have also worked who have employment in organizations representing teachers. It would provides [*sic*] that… it additionally… last year when we did a technical cleanup on the early retirement option there were two areas that we failed to actually allow teachers to go back and pick up their service. And so it corrects this technicality." *Id.* at 68-69.

Representative Black, who otherwise questioned the propriety of the bill, conceded, "Staff on both sides have indicated the long-term liability to any state pension system would be minimal." *Id.* at 74 (statements of Representative Black).

¶ 60     Senator Martinez, a sponsor of the original bill, described the new version of it to the Senate. She stated that the bill "provides that a [*sic*] officer or an employee of the statewide teacher organization or officers of a national teacher organization, who is a certified teacher, may establish service credit." 94th Ill. Gen. Assem., Senate Proceedings, Nov. 30, 2006, at 50 (statements of Senator Martinez). She assured her colleagues that the bill "does not have any unfunded liability," concluding, "[i]t's a great bill," and "[i]t's a great day." *Id.* at 51.

¶ 61     Those comments indicate that the legislature was not concerned with fiscal discipline or defense of state revenue. The House and Senate sponsors of the bill that included the 2007 amendment attested that it would have little or no impact on state coffers because teacher organization employees would bear any costs. The bill was intended to be a quick, technical fix of an inadvertent omission in an earlier statute. A discrete subset of teacher's organization

employees—those who were not previously TRS members—would have a 90-day window from the date that Senate Bill 36 passed both houses of the General Assembly to the date that Governor Blagojevich signed the bill and the law went into effect to become certified as teachers and establish teaching service, so they could purchase retroactive credit toward a constitutionally protected public sector pension for their private sector work.[5]

¶ 62    The legislature itself later questioned its earlier aim, opining that the amendment violated article VIII, section 1(a), of the 1970 Illinois Constitution, which provides, "Public funds, property or credit shall be used only for public purposes." Ill. Const. 1970, art. VIII, § 9; see Pub. Act 97-651, § 97 (eff. Jan. 5, 2012). Assuming, *arguendo*, that the state interest is legitimate, the question becomes whether that 90-day window is rationally related to that interest or is, instead, arbitrary and violative of the special legislation clause.

¶ 63    This court addressed a similar question in *Peoria School District*. There, a school district brought suit against a police union, the Illinois Educational Labor Relations Board, and the Illinois Labor Relations Board, seeking a declaration that a new statute violated the special legislation clause. The statute provided that police and security officers directly employed by school districts on its effective date were public employees, subject to the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2010)). *Peoria School District*, 2013 IL 114853, ¶ 6. Consequently, disputes between such districts and the officers' unions would be sent to interest arbitration. *Id.* ¶ 9. At the time that the statute became effective, the school district challenging it was the only district in the state that directly employed security officers. *Id.* ¶ 10. The trial court rejected the district's constitutional challenge, but the appellate court reversed the trial court's decision. *Id.* ¶¶ 21-22.

¶ 64    This court held that the statute was unconstitutional special legislation. *Id.* ¶ 60. We observed that, under the first step of the special legislation clause analysis, a consideration of "those who might occupy a similar position *in the future*[ ] is not foreign to our special legislation jurisprudence." (Emphasis in original.) *Id.* ¶ 43. This court has remained "steadfast in analyzing special legislation challenges by reference to not only classes *presently* existing, but also those that might be similarly situated *in the future*." (Emphases in original.) *Id.* ¶ 46. A statute that creates a "temporal dichotomy" between those who benefit from it on its effective date and those who cannot benefit from it after that date is not a general law but rather a specific one that violates the special legislation clause. *Id.* ¶ 53 (discussing *Wright v. Central Du Page Hospital Ass'n*, 63 Ill. 2d 313, 331 (1976)). From our cases, we distilled

> "the principle that a law the legislature considers appropriately applied to a generic class presently existing, with attributes that are in no sense unique or unlikely of repetition in the future, cannot rationally, and hence constitutionally, be limited of application by a date restriction that closes the class as of the statute's effective date. Barring some viable rationale for doing so, it would, for example, violate the proscription of the constitution for the legislature to apply a law to a person or entity in existence on the effective date of enactment, but make it inapplicable to a person or entity who assumed those attributes or characteristics the day after the statute's effective date." *Id.* ¶ 54.

---

[5]The actual window was even longer for IFT employees, who had Preckwinkle meeting with them a week before Senate Bill 36 was taken up again in the House and encouraging them to substitute teach.

¶ 65    We found no basis for restricting the reach of the statutory amendment at issue to districts who directly employed police or security officers on its effective date. *Id.* ¶ 59. We added that it was irrational not to extend the benefits of the Act to those school districts that may later employ their own officers. *Id.* We concluded, "there is no reason 'for restricting the advantages' of the legislation to a district with characteristics currently qualifying and 'not extending the same advantages to those districts' qualifying 'at a subsequent time.' " *Id.* (quoting *People ex rel. East Side Levee & Sanitary District v. Madison County Levee & Sanitary District*, 54 Ill. 2d 442, 447 (1973)).

¶ 66    The majority says that the effective date cutoff in *Peoria School District* "bears no relevant similarities" to the cutoff in this case. *Supra* ¶ 30. According to the majority, the cutoff there was "a descriptor," while the cutoff here is "a deadline." *Supra* ¶ 30. The majority's semantics are unconvincing. The statute in *Peoria School District* and the 2007 amendment to section 16-106(10) both created classes, membership in which ended on the effective date of their respective public acts. Compare Pub. Act 96-1257 (eff. July 23, 2010) ("on the effective date of this amendatory Act of the 96th General Assembly"), with Pub. Act 94-1111 (eff. Feb. 27, 2007) ("on or before the effective date of this amendatory Act of the 94th General Assembly").

¶ 67    *Peoria School District* clarifies the proper special legislation clause analysis for statutes with effective date cutoffs. A statute that creates a classification benefitting only a person or group with certain characteristics on its effective date discriminates in favor of that person or group and against a person or group who may obtain those characteristics later. When that classification is based simply upon the fortuity of falling on the early side of a moment in time, it is arbitrary and not rationally related to a legitimate government interest.

¶ 68    Like the effective date cutoff in *Peoria School District*, the cutoff here was arbitrary. There is no reason for restricting the advantages of the 2007 amendment to section 16-106(10) to teacher organization employees who met the amendment's certification and teaching service requirements before February 27, 2007, and not extending those same advantages to employees who met those requirements thereafter. That arbitrariness is manifest in how the subject of possible TRS eligibility was presented within the IFT. Teacher organization employees who attended one of Preckwinkle's meetings were counseled to begin the process of preemptively satisfying the certification and teaching requirements of a then-nonexistent proposal for new legislation. They were later advised to complete that process in a narrow window of time between the date that the bill was passed by both houses and the date that it would presumably be signed by Governor Blagojevich and become effective, so they would not be shut out of receiving a constitutionally protected public sector pension for private sector work. That is, IFT employees were advised to meet the requirements of a law that was not yet a law, lest they be excluded from its benefits once it became a law. They even received assurances from Preckwinkle that he would "slow down the bill signing process," so everyone "who is in the pipeline for completing a substitute teaching assignment" could "get coverage" under a statute that had not gone into effect. Slamming a window shut before it ever opened smacks of special legislation.

¶ 69    The trial court correctly held that the 2007 amendment violated the special legislation clause. Because I would hold that the 2007 amendment was unconstitutional, I would also hold that it conferred no rights for the pension protection clause to protect. See *People v. Blair*, 2013 IL 114122, ¶ 28 (stating that an unconstitutional statute is " ' "not a law" ' " and " ' "confers

- 16 -

no rights" ' " (quoting *Perlstein v. Wolk*, 218 Ill. 2d 448, 454 (2006), quoting *Norton v. Shelby County*, 118 U.S. 425, 442 (1886))).

¶ 70　　　　For the foregoing reasons, I respectfully dissent.

¶ 71　　　　JUSTICES THOMAS and GARMAN join in this dissent.