2020 IL App (4th) 190314

NO. 4-19-0314

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 9, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ALVIN F. MARSH; BEVERLY MARSH; MARSH ENTERPRISES, d/b/a Sand Burr Farms; ALVIN F. MARSH TRUST; HENRY LIKES; MAXINE LIKES; GARY WESTERMEYER; TERESA WESTERMEYER; FRED BARNETT; ROBERTA BARNETT; JIMMIE GREGORY; and MARCELLA GREGORY, | ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Scott County No. 10L3 |
| Plaintiffs-Appellants and Cross-Appellees, | ) ) | |
| v. | ) | |
| SANDSTONE NORTH, LLC; SANDSTONE SOUTH, LLC; HOLLIS SHAFER; GENESIS PORK, LLC; and ILLINI PORK, LLC, | ) ) ) | |
| Defendants-Appellees and Cross-Appellants. | ) ) | Honorable David R. Cherry, Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Steigmann and Justice Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiffs—Alvin F. and Beverly Marsh, Marsh Enterprises, d/b/a Sand Burr Farms, Alvin F. Marsh Trust, Henry and Maxine Likes, Gary and Teresa Westermeyer, Fred and Roberta Barnett, and Jimmie and Marcella Gregory—brought a "private temporary nuisance action" against defendants—Sandstone North, LLC, Sandstone South LLC, Hollis Shafer, Genesis Pork, LLC, and Illini Pork, LLC—alleging defendants' hog farming operations created foul and obnoxious odors that interfered with plaintiffs' use and enjoyment of their neighboring properties.

On May 24, 2016, a jury returned a verdict in favor of defendants. Plaintiffs appeal, arguing the trial court erred by (1) denying their motion for a new trial based on "juror misconduct," (2) declining to instruct the jury pursuant to Illinois Pattern Jury Instructions, Civil, No. 5.01 (approved Dec. 8, 2011) (hereinafter IPI Civil No. 5.01), and (3) instructing the jury using three non-IPI instructions submitted by defendants. Defendants cross-appeal, arguing the court erred by denying their request for reasonable attorney fees made pursuant to section 4.5 of the Farm Nuisance Suit Act (Act) (740 ILCS 70/4.5 (West 2014)). We reverse the court's denial of defendants' motion for reasonable attorney fees and remand with directions that the court grant the motion and enter an appropriate fee award. We otherwise affirm the court's judgment.

¶ 1                                    I. BACKGROUND

¶ 2         Plaintiffs reside on and/or own property near defendants' hog farming operations in Scott County, Illinois. In June 2010, they initiated the underlying cause of action against defendants and, in August 2011, filed a second amended complaint. Plaintiffs identified the case as "a private temporary nuisance action" and alleged that "[o]ffensive and noxious odors frequently emanate[d] from [d]efendants' swine facilities," impairing their "ability to use and enjoy their property" and causing "substantial damage to [their] quality of life."

¶ 3         In their second amended complaint, plaintiffs alleged defendants raised approximately 7500 hogs at their Scott County facilities. They maintained that defendants' "swine factories [were] negligently and grossly mismanaged," in that defendants "intentionally disregard[ed] their duties and responsibilities" with respect to the handling and storage of animal waste and the disposal of dead hogs. They also alleged that defendants' "swine factories" were negligently constructed.

¶ 4        On March 24, 2014, a jury trial began in the matter. However, the trial court declared a mistrial after finding that "activists" had passed out literature on concentrated animal feeding operations in the courtroom after proceedings had commenced. On May 2, 2016, a second jury trial began. On May 24, 2016, the jury returned a verdict in favor of defendants.

¶ 5        On December 9, 2016, plaintiffs filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Relevant to this appeal, they sought a new trial on the following grounds: (1) the trial court erred by instructing the jury with several nonpattern instructions proposed by defendants, which they argued were confusing, misleading, or presented incorrect statements of law (instructions 12, 13, 17, and 19); (2) the court erred by denying their request for an adverse-inference instruction based on IPI Civil No. 5.01 because defendants "undertook a massive cleanup effort of [their] facilities" prior to a site visit by plaintiffs' experts; and (3) juror misconduct. As to the last claim, plaintiffs asserted that posttrial Facebook postings by juror Kelly Howard demonstrated that she "was biased" against plaintiffs and had "pre-judged the case." On April 22, 2019, the court denied plaintiffs' motion.

¶ 6        The record also reflects that on June 16, 2016, defendants filed a motion for costs, expenses, and reasonable attorney fees they incurred in successfully defending plaintiffs' claims against them pursuant to section 4.5 of the Act. 740 ILCS 70/4.5 (West 2014). On May 6, 2019, the trial court entered an order denying the motion. In setting forth its ruling, the court made the following findings:

"1. The *** Act in its Purpose clause declares 'When nonagricultural land uses extend into agricultural areas, farms often become the subject of nuisance suits.' The case at bar does not pit non-agricultural interests against agricultural

- 3 -

interests. The record reflects that all of the parties in this action, both Plaintiffs and Defendants, are all farmers engaged in agricultural pursuits. As such, this fact situation does not come within the protection of the *** Act for the [d]efendants.

2. The suit by the Plaintiffs was to recover damages suffered as a result of the alleged negligent operation of an agricultural pursuit. The Jury returned a verdict in favor of the Defendants, finding that the Defendants were not negligent in the operation of their facility.

3. Section 3 of the said *** Act specifically acknowledges the exemption of application of the [A]ct to actions alleging negligent or improper operation of any farm.

4. The Defendant[s] having prevailed in *** such a negligence action cannot avail themselves of Section 4.5 of the said *** Act when that [A]ct does not apply to the issues that were submitted to the trier of fact."

¶ 7    This appeal and cross-appeal followed.

¶ 8                                    II. ANALYSIS

¶ 9    On appeal, plaintiffs argue they are entitled to a new trial based upon juror misconduct and the trial court's failure to properly instruct the jury. Defendants cross-appeal, asserting the court erred by denying their motion for costs, expenses, and reasonable attorney fees associated with defending themselves in the underlying litigation brought pursuant to section 4.5 of the Act. We note *amicus curiae* briefs in support of defendants' cross-appeal have been filed by both the Illinois Agricultural Association, a/k/a the Illinois Farm Bureau, and the Illinois Pork Producers Association. On review, we address each appeal and argument in turn.

- 4 -

¶ 10                              A. Plaintiffs' Appeal

¶ 11                              1. *Juror Misconduct*

¶ 12       On appeal, plaintiffs first argue they are entitled to a new trial based on "juror misconduct." Specifically, they assert that juror Howard's posttrial Facebook posts showed she lied during *voir dire* and was biased against them.

¶ 13       The record shows that during *voir dire*, Howard stated that she did not know anything about the case but was familiar with "the names" of two plaintiffs—Henry and Maxine Likes. She denied that knowing those plaintiffs' names would influence her and asserted she could be a fair and impartial juror. As a juror, she would base her decision on the evidence and not on sympathy for either side or bias or prejudice for or against any party. Howard represented that she would listen carefully to the evidence before making a decision and follow the written instructions provided by the judge. She denied having any concerns about "anything in [her] life" if she had to spend two or three weeks as a juror. Further, Howard reported that she grew up on a farm. She also acknowledged having a Facebook account but denied posting any "personal stuff" on Facebook, explaining as follows: "I like [to] post birthday wishes to my friends. I mean, I look at pictures. I don't post stuff on there."

¶ 14       In their posttrial motion, plaintiffs raised the issue of juror misconduct by Howard and attached to their motion copies of Facebook postings Howard purportedly made after the trial. According to plaintiffs, Howard's initial posting stated as follows:

> "SOME PEOPLE AMAZE ME!!!! For the last 3 weeks (22 days to be exact) I along with 13 other people had to put our lives on hold—missing vacations graduations and work as well as not being able to read the newspaper or listen to

local news to do our civic duty of being a juror for a trial of hog s*** and odor from a hog business in rural Scott County that supposedly affected the lives of 10 people that lived in the vicinity of the business. Seriously[,] like the owner of that business had control over the way the wind blew or how hot the weather got. The trial concluded today and not to the liking of the 10 people that filed the suit. The more money some people have the more they think they can do whatever they want to ruin other people. Not the outcome in this case. Thinking they should not have put a person on this jury that was raised on a farm in the country (just my opinion though). Rant over."

Plaintiffs also pointed out that after another individual commented "[w]ow" in response to Howard's post, Howard responded to the individual, stating the following: "That's what I said for three weeks ***. It is unbelievable what some people will do these days."

¶ 15    Plaintiffs argue the Facebook posts show Howard displayed sympathy for farmers, had knowledge about plaintiffs' wealth or income beyond what was shown at trial, and discussed the case while the trial was ongoing. They claim her postings establish that she made untrue statements during *voir dire*, including that she (1) had no concerns about the effect of a two to three week trial on her life, (2) could be fair and impartial, (3) had no relationship with the plaintiffs and was not influenced by knowing their names, (4) would listen to the evidence before making a decision, and (5) did not post "personal stuff" on Facebook.

¶ 16    Defendants contend the trial court did not abuse its discretion by denying plaintiffs' motion for a new trial based on Howard's alleged posttrial statements. They argue that the purported Facebook posts cannot be "considered" because they were not authenticated and because

they were inadmissible hearsay. In the alternative, they argue the posts did not demonstrate that Howard testified falsely during *voir dire* or that she was biased.

¶ 17 Initially, we agree with plaintiffs' assertion that defendants have forfeited any challenge to the trial court's consideration of the Facebook posts by not raising those issues in the proceedings below. Issues not raised with the trial court are forfeited on review. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14, 43 N.E.3d 1005. In this instance, defendants did not object to the trial court's consideration of the Facebook posts on either authentication or hearsay grounds. Instead, in both their written response to plaintiffs' posttrial motion and argument before the court, defendants implicitly acknowledged Howard as the author of the Facebook posts and presented argument that invited the court's consideration of those posts. Accordingly, defendants' authentication and hearsay challenges to the posts have been forfeited. We decline to consider those challenges and address the merits of plaintiffs' "juror misconduct" claim.

¶ 18 "The purpose of *voir dire* is to assure the selection of an impartial panel of jurors who are free from bias or prejudice." *Kingston v. Turner*, 115 Ill. 2d 445, 464, 505 N.E.2d 320, 328 (1987). "The standard for juror impartiality is whether the juror had such fixed opinions that he could not judge impartially." *In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶ 20, 972 N.E.2d 351. "Mere suspicion of bias or impartiality is not evidence and does not disqualify a juror." *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 48, 623 N.E.2d 246, 255 (1993).

¶ 19 Further, "[a] motion for a new trial based on a juror's false testimony during *voir dire* should be denied unless the movant establishes both that the juror answered falsely and that prejudice resulted." *Diaz v. Kelley*, 275 Ill. App. 3d 1058, 1064, 657 N.E.2d 657, 662 (1995)

(citing *Pekelder v. Edgewater Automotive Co.*, 68 Ill. 2d 136, 368 N.E.2d 900 (1977)). We review the trial court's denial of such a motion for an abuse of discretion. *Crowley v. Watson*, 2016 IL App (1st) 142847, ¶ 63, 51 N.E.3d 69.

¶ 20    Here, we find the Facebook posts identified by plaintiffs failed to reflect either that Howard was a biased juror or that she answered falsely during *voir dire*. Clearly, Howard expressed strong opinions about the case in the Facebook posts. However, it is undisputed that the posts were not made until after the jury had reached its verdict and the trial was concluded. Contrary to plaintiffs' assertions, the posts do not reflect that Howard held pretrial bias in favor of farmers, that her statements about plaintiffs' wealth were based on anything more than impressions she formed from her observations at trial, or an admission that she discussed the case while the trial was ongoing. Instead of showing that Howard held fixed opinions inconsistent with impartiality while fulfilling her responsibilities as a juror, the posts indicate—as defendants argue—that Howard was expressing her "post-verdict assessment or analysis of the trial."

¶ 21    On appeal, plaintiffs additionally point to statements the trial court made about Howard outside of the jury's presence and during the trial, arguing they support a finding that Howard "may have infected the jury." Specifically, the record shows that on the last day of the trial and prior to closing arguments, the court and the parties conferred outside the presence of the jury and the court made the following statements:

> "There is always somebody when you walk in a room, they walk in a room and focus has to be on them. Always. And they have to create or preserve, find something that allows them to step into the center of attention. And we have several people on the jury like that. Kelly Howard is one of those and she is toned down a

lot. Greg Lewis is the other one. He stopped me in the parking lot, said I got to talk to you, tell the bailiff. So, he told the bailiff and I had him write it out. And this is nothing but this is just him placing himself in the center of attention.

Okay. I don't see any problems but I wanted to advise you."

In context, the court's statements reflect that it was addressing an issue with a different juror that had been brought to its attention, not Howard. There is no indication from the record that, during the trial, Howard was improperly commenting about the case to the other jurors or otherwise.

¶ 22    Given the circumstances presented, the record does not support plaintiffs' claims that Howard lied during *voir dire* or that they were prejudiced in any manner. As a result, the trial court did not abuse its discretion by denying their motion for a new trial based on Howard's alleged "juror misconduct."

¶ 23                                    2. *IPI Civil No. 5.01*

¶ 24    Plaintiffs next argue that the trial court erred by denying their request to give the jury an "adverse-inference instruction" based on IPI Civil No. 5.01. They argue the instruction was warranted due to evidence that defendants "cleaned up" their property—in particular, bones on their property—prior to a site visit by plaintiffs' experts. They contend defendants' actions in cleaning up were relevant because the presence of bones could have supported their claims that defendants "left the dead animals out to fully decay," contributing to the foul odors plaintiffs were exposed to as defendants' neighbors. Plaintiffs further complain that the court erred by failing to articulate a reason for denying the requested instruction.

¶ 25    IPI Civil No. 5.01, also referred to as the "missing-evidence instruction," is given to "advise the jury that, if a party fails to offer evidence that is within its power to produce, the

jury may infer that this evidence would be adverse to that party." *Simmons v. Garces*, 198 Ill. 2d 541, 573, 763 N.E.2d 720, 740 (2002). The instruction states as follows:

"If a party to this case has failed [to offer evidence] [to produce a witness] within his power to produce, you may infer that the [evidence] [testimony of the witness] would be adverse to that party if you believe each of the following elements:

1. The [evidence] [witness] was under the control of the party and could have been produced by the exercise of reasonable diligence.

2. The [evidence] [witness] was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have [offered the evidence] [produced the witness] if he believed [it to be] [the testimony would be] favorable to him.

4. No reasonable excuse for the failure has been shown." IPI Civil No. 5.01.

To warrant giving the instruction, there must be "some foundation evidence" presented as to each of the four listed elements. *Wetherell v. Matson*, 52 Ill. App. 3d 314, 318, 367 N.E.2d 472, 475 (1977).

¶ 26        Additionally, "[b]efore giving the instruction, the trial court must first determine whether, in all likelihood, the party would have produced the witness under the facts and circumstances of the case unless the testimony would be unfavorable." *Wilkerson v. Pittsburgh*

- 10 -

*Corning Corp.*, 276 Ill. App. 3d 1023, 1029, 659 N.E.2d 979, 983 (1995). If evidence "would be merely cumulative of facts already established, the instruction is not warranted." *Id.* "The decision whether to use the instruction or permit the argument is reserved to the sound discretion of the court." *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 22, 541 N.E.2d 643, 651 (1989).

¶ 27        Here, at trial, Brian Bradshaw testified he was an owner and manager of the defendants' hog farming operations. He acknowledged that just prior to the time that plaintiffs' experts were scheduled to view defendants' properties and facilities in March 2013, defendants "cleaned up because [they] knew [they] were having company coming." During the cleanup, they "took down some trees" and "harrowed" areas around buildings. Bradshaw testified he met with employees and told them to "haul the trash off" and "mow the grass." He further testified as follows:

"Q. You told [your employees] to pick up bones before the visit?

A. I don't think we did much of that *** but, yeah, we might have picked up some bones.

Q. All right. And you told the employees to pick them up when they found them, didn't you?

A. Absolutely, yeah.

Q. All right. And you agree that bones were found all over the South Sandstone site?

A. I do. I don't think them are all ours, but I do agree, yes."

¶ 28        As stated, plaintiffs argue on appeal both that the trial court erred in refusing to give

an adverse-inference instruction based on IPI Civil No. 5.01 and that it erroneously failed to state the basis for its refusal. We note plaintiffs failed to raise the latter claim with the trial court and, therefore, have forfeited it for purposes of review. *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 14.

¶ 29 However, even disregarding plaintiffs' forfeiture, we disagree with their assertion that the bases for the trial court's decision as to IPI Civil No. 5.01 are not reflected in the record. During the jury instruction conference, the parties presented argument regarding the propriety of giving IPI Civil No. 5.01, and ultimately, the court rejected the instruction. In addressing the issue, the court commented as follows: "[T]he jury saw numerous, hundreds of bones laying around the premises. What [*sic*] 20 extra bones around the grounds makes a difference?" Further, it stated as follows:

> "I think the testimony of *** Bradshaw that he cleaned up when company was coming was a very good explanation and not giving him more credibility to him than he should have, but I think that was a sincere comment that he made in describing what he did it [*sic*] and when he did it. Implication that you would like to make is he is covering up some evidence of something, I think [that] went away when he claimed credit for those bones near the building which I don't think I would have done because some of those bones appeared to be dried and bleached and maybe not his bones but bones that were there *** as a result of digging the foundations. I think I would have left that alone[,] but he didn't. So[,] I think the jury can draw the inference they want to."

¶ 30 Thus, contrary to plaintiffs' arguments on appeal, the record does reflect the trial court's rationale for denying an adverse-inference instruction. In particular, the court's comments

indicate it rejected the instruction on the basis that the "missing evidence," *i.e.*, the bones cleaned up by defendants, was cumulative of other evidence of bones on defendants' properties and because the court determined it was not likely that the cleanup was done to hide unfavorable evidence. See *Wilkerson*, 276 Ill. App. 3d at 1029 ("Before giving the instruction, the trial court must first determine whether, in all likelihood, the party would have produced the witness under the facts and circumstances of the case unless the testimony would be unfavorable."). Ultimately, these were appropriate considerations for the court and warranted not giving the instruction. Plaintiffs' arguments on appeal fail to establish an abuse of discretion by the court with respect to either its determination that the missing evidence was cumulative or that the cleanup was not done to hide unfavorable evidence. Moreover, we question whether circumstances such as those presented here, where a defendant in a nuisance lawsuit "cleans up" its premises prior to the opposing party's inspection, several years prior to trial, could constitute "missing evidence" warranting the court's giving of IPI Civil No. 5.01.

¶ 31 Additionally, assuming *arguendo* that an adverse-inference instruction based on IPI Civil No. 5.01 was warranted, we find no prejudice to plaintiffs resulted from the failure to give that instruction. "On appeal, a reviewing court will reverse and grant a new trial based on a trial judge's error in instructing the jury only when the error resulted in prejudice to the appealing party." *Wilkerson*, 276 Ill. App. 3d at 1030. In *Simmons*, 198 Ill. 2d at 574, the supreme court found no unfair prejudice to the plaintiffs from the trial court's failure to give an instruction based on IPI Civil No. 5.01 where the court "nevertheless allowed [the] plaintiffs to argue whatever inferences they felt the jury should draw from [the] defendant's failure to produce" evidence. The same circumstances are presented by this case, as the record shows the court permitted plaintiffs

- 13 -

to argue to the jury that adverse inferences should be drawn from defendants' challenged actions. Accordingly, plaintiffs did not suffer unfair prejudice and reversal for a new trial is unwarranted.

¶ 32                            3. *Nonpattern Jury Instructions*

¶ 33        Plaintiffs finally argue that the trial court erred by accepting three nonpattern jury instructions submitted by defendants. They assert the instructions were long, confusing, and misleading. Plaintiffs also assert that two of the instructions contained inaccurate statements of the law.

¶ 34        "The function of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence and, as a result, jury instructions must state the law fairly and distinctly and must not mislead the jury or prejudice a party." (Emphasis omitted.) *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 507, 771 N.E.2d 357, 372 (2002). Illinois Supreme Court Rule 239(a) (eff. Apr. 8, 2013) provides that when a trial court determines a jury should be instructed on a subject in a civil case, applicable pattern jury instructions should be used. However, where pattern instructions do "not accurately state the law, the court may instruct the jury pursuant to a nonpattern instruction." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273, 775 N.E.2d 964, 972 (2002); see also *Dillon*, 199 Ill. 2d at 505 (stating that "where *** pattern instructions are inadequate," additional instruction with nonpattern instructions is appropriate). Nonpattern instructions given to a jury "should be simple, brief, impartial, and free from argument." Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013).

¶ 35        "Generally, a trial court's decision to grant or deny an instruction is reviewed for abuse of discretion." *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13, 951 N.E.2d 1131. " 'The standard for determining an abuse of discretion is whether, taken as a whole, the instructions

are sufficiently clear so as not to mislead and whether they fairly and correctly state the law.' " *Id.* (quoting *Dillon*, 199 Ill. 2d at 505). "When the question is whether the applicable law was conveyed accurately, however, the issue is a question of law, and our standard of review is *de novo*." *Id.*

¶ 36    "A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz*, 201 Ill. 2d at 274. Further, "[a] party forfeits the right to challenge a jury instruction that was given at trial unless it makes a timely and specific objection to the instruction and tenders an alternative, remedial instruction to the trial court." *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 557, 901 N.E.2d 329, 353 (2008).

¶ 37                              a. Defendants' Proposed Instruction No. 3

¶ 38    Plaintiffs first challenge defendants' proposed jury instruction No. 3 on the basis that it was "neither simple nor brief" and, instead, was confusing and misleading. That instruction, as modified and given to the jury as Instruction No. 12, provided as follows:

> "Plaintiffs have alleged that one or more of the Defendants' actions have
>
> created a nuisance that is both 'private' and 'temporary.' A private nuisance is an
>
> invasion of another's interest in the use and enjoyment of his or her land. This
>
> invasion must be:
>
> 1.) Substantial,
>
> 2.) And either Intentional or Negligent,
>
> 3.) And unreasonable.
>
> If you find that that [*sic*] one or more of the Defendants have created a

- 15 -

private nuisance, you must determine whether it is one that is temporary in nature. A private nuisance is temporary if it meets the three criteria above and is also:

1.) Occasional, Intermittent, or recurrent,

2.) Or remediable, removable, or abatable,

3.) Or caused by the negligent construction of a legal enterprise or the negligent manner of its operation.

If the invasion alleged by each of the Plaintiffs does not meet these requirements, those Plaintiffs have not proven the existence of a private temporary nuisance and your verdict will be for the Defendants as to that Plaintiff."

¶ 39     Initially, defendants argue plaintiffs "waived" any objection to the challenged instruction by conceding during the jury instruction conference that it accurately stated the law. See *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 26, 988 N.E.2d 75 ("Waiver is the intentional relinquishment or abandonment of a known right." (Internal quotation marks omitted.)). We disagree.

¶ 40     The record shows plaintiffs' counsel raised objections to defendants' proposed instruction No. 3 on the bases that it did not accurately state nuisance law and because it was not "simple." Plaintiffs also submitted proposed alternative instructions of their own and argued in their posttrial motion that the above instruction was confusing and misleading. Under these circumstances, we decline to find waiver as to plaintiffs' claim that the proposed instruction was confusing and misleading—the only challenge to defendants' proposed instruction No. 3 that they raise on appeal.

¶ 41     Nevertheless, although we do not find waiver, we do find that plaintiffs have

presented a deficient argument in challenging this nonpattern instruction on appeal. We note that the "Argument" section of an appellant's brief must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). "A conclusory assertion, without supporting analysis, is not enough." *Wolfe v. Menard, Inc.*, 364 Ill. App. 3d 338, 348, 846 N.E.2d 605, 613 (2006). Further, "[p]oints not argued are forfeited." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

¶ 42        In this instance, plaintiffs' argument is conclusory and unsupported by developed legal analysis. Plaintiffs simply conclude that the challenged nonpattern instruction was confusing and misleading and provide virtually no explanation for their conclusions. In their brief, plaintiffs set forth no viable alternative to the challenged instruction, fail to identify either the objectionable language of the challenged instruction or the proposed alternatives they submitted to the trial court, and cite no legal authority relative to the issue of a private and temporary nuisance.

¶ 43        Further, the only potential basis plaintiffs provided for their conclusory statements that the challenged instruction was misleading was that one juror, Gregory Lewis, expressed confusion after the trial, in that he "thought [p]laintiffs had to prove the invasion was 'continuous.' " However, plaintiffs provide no legal authority to support the argument that the posttrial statements of a juror can be used to establish that the trial court erred in instructing the jury. In fact, as defendants' point out, case authority indicates otherwise. See *Chalmers v. City of Chicago*, 88 Ill. 2d 532, 539, 431 N.E.2d 361, 365 (1982) (stating "the testimony or affidavits of jurors cannot be used to show that the jury misunderstood the instructions or the law").

¶ 44        Given the deficiencies in plaintiffs' argument on appeal, we find they have forfeited their challenge to any instruction given to the jury based on defendants' proposed jury instruction

- 17 -

No. 3. We decline to consider their claims that the challenged instruction was misleading or confusing.

¶ 45                                        b. Defendants' Proposed Instruction No. 4

¶ 46         Plaintiffs next challenge defendants' proposed jury instruction No. 4, arguing it contained inaccurate statements of the law and was argumentative. That proposed instruction was given to the jury as Instruction No. 13 and provided as follows:

> "When I use the expression 'substantial invasion,' the invasion must be severe enough to constitute a material annoyance to a reasonable person of ordinary sensibilities. This means that the invasion by odor, flies and/or dust must be enough to offend a reasonable person, rather than a person who is abnormally sensitive."

¶ 47         On appeal, plaintiffs argue that the above instruction is legally inaccurate because it references "a person who is abnormally sensitive." They cite case authority for the proposition that the correct "standard for determining if particular conduct constitutes a nuisance is the conduct's effect on a reasonable person." *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 204, 680 N.E.2d 265, 277 (1997) (citing *Belmar Drive-In Theatre Co. v. Illinois State Toll Highway Comm'n*, 34 Ill. 2d 544, 547, 216 N.E.2d 788, 791 (1966)).

¶ 48         However, as defendants note, the same cases plaintiffs cite reference a plaintiff's use of his land as being "abnormally sensitive" to a defendant's interference, providing as follows:

> "[I]n deciding whether a particular annoyance is sufficient to constitute a nuisance the criterion is 'its effect upon an ordinarily reasonable man,— that is, a normal person of ordinary habits and sensibilities, ***.' [Citations.] As stated ***, 'the injury must be something more than *** a question of mere delicacy or

- 18 -

fastidiousness arising from elegant and dainty habits of life ***.' The same doctrine *** has been applied by American and English courts where the use to which a plaintiff puts his land is *abnormally sensitive* to the type of interference caused by the defendant ***." (Emphasis added.) *Belmar*, 34 Ill. 2d at 547.

Citing the above language in *Belmar*, this court has held that "[i]n determining whether a particular annoyance constitutes a nuisance, the court is to consider the effect of the annoyance on an ordinary, reasonable person, *rather than the effect on a person who is abnormally sensitive*." (Emphasis added.) *Kolstad v. Rankin*, 179 Ill. App. 3d 1022, 1032-33, 534 N.E.2d 1373, 1380 (1989); see also *Woods v. Khan*, 95 Ill. App. 3d 1087, 1090, 420 N.E.2d 1028, 1030 (1981) (stating that complaining homeowners in a nuisance action "cannot be found to be unduly sensitive"). Thus, contrary to plaintiffs' assertions on appeal, relevant case authority does contain references to an "abnormally sensitive" plaintiff or use of a plaintiff's land. As a result, their assertion that the challenged instruction misstates the law by using such language is without merit.

¶ 49        Next, plaintiffs additionally assert the "abnormally sensitive" person language in the challenged instruction was argumentative. However, again, their brief contains only a conclusory statement of error with no legal analysis of the issue. Accordingly, we find this argument forfeited and decline to consider it.

¶ 50        Finally, as stated, plaintiffs also claim that the above instruction is legally inaccurate because it defines a "substantial invasion" by using the phrase "material annoyance." Plaintiffs claim the phrase "material annoyance" does not appear in any of the "leading cases" and that none of those cases provide a definition of what constitutes a "substantial invasion." Critically, however, plaintiffs fail to cite any of the "leading" nuisance cases to which they refer. As expressed

- 19 -

above, an appellant's brief must "contain the contentions of the appellant and the reasons therefor, *with citation of the authorities* and the pages of the record relied on." (Emphasis added.) Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Plaintiffs' failure to cite legal authority to support their claim results in forfeiture of the issue on review. See *Ford v. Round Barn True Value, Inc.*, 377 Ill. App. 3d 1109, 1115, 883 N.E.2d 20, 25 (2007) (holding a plaintiff forfeited arguments on appeal "by failing to cite authority as required by Supreme Court Rule 341(h)(7)").

¶ 51        Additionally, even if we were to ignore plaintiffs' forfeiture, we would find their claim to be without merit. It has been held that "[a] private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land." *Chicago Flood Litigation*, 176 Ill. 2d at 204. Further, case authority establishes that "[a] substantial and intentional invasion must be severe enough to constitute a *material annoyance* to the adjoining landowners and be foreseen as to its consequences by the offending landowner." (Emphasis added.) *Woods*, 95 Ill. App. 3d at 1089-90; see also *Belmar*, 34 Ill. 2d at 547 ("[T]o constitute a nuisance, the act, structure or device complained about must cause some injury *** and must work some *material annoyance*, inconvenience or other injury to the person or property of another." (Emphasis added.)); *Kolstad*, 179 Ill. App. 3d at 1032 ("Any unreasonable, unwarranted, or unlawful use of one's property such that another's use and enjoyment of his property is *invaded by a material annoyance*, inconvenience, discomfort, or hurt is a nuisance." (Emphasis added.)); *Statler v. Catalano*, 167 Ill. App. 3d 397, 403, 521 N.E.2d 565, 570 (1988) (finding evidence used to prove that the defendants' actions caused plaintiffs' annoyance and extreme discomfort was relevant because it "relate[d] to the element of *material annoyance* of plaintiffs and *** to the use and enjoyment of plaintiffs' home" (emphasis added)); *Great Atlantic & Pacific Tea Co. v. La Salle National Bank*, 77 Ill. App.

3d 478, 485, 395 N.E.2d 1193, 1198 (1979) (stating a private nuisance "is an individual wrong arising from an unreasonable, unwarranted or unlawful use of one's property producing such *material annoyance*, inconvenience, discomfort, or hurt that the law will presume a consequent damage" (emphasis added)).

¶ 52                           c. Defendants' Proposed Instruction No. 7

¶ 53         In their final jury instruction challenge, plaintiffs argue the trial court erred by instructing the jury consistent with defendants' proposed instruction No. 7 on the basis that it also contains an inaccurate statement of the law. The instruction as given to the jury stated as follows:

> "When I use the expression, 'unreasonable invasion,' I mean that the extent of the harm sustained by Plaintiffs outweighs the benefits of Defendants' businesses and outweighs the suitability of the location of that business.
>
> The determination of whether the extent of harm outweighs the benefit of the Defendants' businesses and suitability of the location for raising hogs includes, as well as your own life experiences, the balancing and consideration of the following questions:
>
> (1) Are/were Defendants *** engaged in a useful enterprise?
>
> (2) Is this area of rural Scott County well suited for confined hog farming?
>
> (3) Which came first, Defendants' operations or Plaintiffs?
>
> (4) Can the facilities be operated in a different manner such that odor, flies, and/or dust can be reduced?
>
> (5) Is modification of the facilities practical?"

¶ 54         On appeal, plaintiffs argue the third factor listed above "is a completely inaccurate

statement of law" because section 3 of the Act (740 ILCS 70/3 (West 2014)) makes "coming to the nuisance" an absolute bar to a nuisance lawsuit rather than simply a factor for consideration. Defendants initially respond by asserting that plaintiffs forfeited this specific argument for purposes of appeal by failing to raise it with the trial court. However, a review of the record refutes defendants' forfeiture argument.

¶ 55        At trial, plaintiffs' counsel objected to defendants' proposed instruction and argued that "which came first [the] hog farming or Plaintiffs" was "not something that [the jurors] balance ***." Plaintiffs' counsel also argued that the trial court had already ruled that "regarding the *** Act" and its applicability, "Plaintiffs were there before the Defendants were there." The court then commented on the evidence, stating as follows:

> "THE COURT: What the jury heard was these, each of these Plaintiffs talking about where they live and how long they have been there and what their situation was, their families.

> * * *

> THE COURT: And then this Defendant comes in[ ]to existence and they built this operation. The jury can make, *** no matter what I say, they can make a determination as to who was there first. I don't have to stand up and tell them they were there first."

Defendants' counsel responded by arguing that the third factor was supported by case authority but, nevertheless, offered to "take it out" if plaintiffs' counsel was "offended by number [three]." Following further argument, the court stated: "Strike number [three]. We will allow it."

¶ 56        Next, in their posttrial motion, plaintiffs objected to the above instruction, in part,

because "question three *** of the test was ordered to be removed by the [trial court] during the jury instruction conference, *but that question was still given.*" (Emphasis in original.) When arguing plaintiffs' posttrial motion to the court, plaintiffs' counsel again maintained the instruction did not accurately state the law because section 3 of the Act made "coming to the nuisance" an absolute bar to a nuisance action and "not a factor to be considered." Thus, we find the record clearly shows plaintiffs raised their claim of error to the challenged instruction with the court and, as a result, the issue has not been forfeited by plaintiffs.

¶ 57　　　　　Although not discussed at length by either party on appeal, the record also reflects that the trial court agreed with plaintiffs' argument on the proposed instruction and struck the objected-to language before accepting the instruction. The court's handwritten notes on the proposed instruction further support such a finding, stating the instruction would be "[g]iven w/out [three]." Despite this determination by the court, the parties agree on appeal that the instruction was given to the jury with the third factor included. Therefore, we consider whether reversible error occurred in the giving of that portion of the instruction.

¶ 58　　　　　As stated, "[a] reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz*, 201 Ill. 2d at 274. In this instance, assuming *arguendo* the challenged instruction was faulty because it instructed the jury to consider and balance with other factors whether defendants' operations or plaintiffs "came first" when determining the existence of an unreasonable invasion, plaintiffs have failed to establish any prejudice. Not only do plaintiffs' arguments on appeal fall far short of even claiming prejudice from the instruction, the record also reflects that the jury could only have weighed the challenged factor in plaintiffs' favor when determining the

- 23 -

unreasonableness of the invasion. As the trial court commented during the jury instruction conference, the evidence at trial showed plaintiffs "came first," before defendants' operations were established. Even in opening statements, defendants acknowledged that the various plaintiffs owned and resided on their properties years before defendants began their hog farming operations in 2007. Given these circumstances, we find no prejudice and no reversible error.

¶ 59                                    B. Defendants' Cross-Appeal

¶ 60          On cross-appeal, defendants argue the trial court erred by denying their motion for reasonable attorney fees pursuant to section 4.5 of the Act (740 ILCS 70/4.5 (West 2014)). Specifically, they argue the court erroneously found the Act did not apply because (1) the parties' lawsuit did "not pit non-agricultural interests against agricultural interests" and (2) defendants "prevailed in *** a negligence action" rather than a nuisance action.

¶ 61          Plaintiffs respond by arguing the trial court correctly denied defendants' motion for attorney fees pursuant to section 4.5 of the Act. Alternatively, they argue section 4.5 is unconstitutional.

¶ 62                          1. *Application of Section 4.5 of the Act*

¶ 63          Defendants' claim involves an issue of statutory interpretation that is subject to *de novo* review. *Vance v. Joyner*, 2019 IL App (4th) 190136, ¶ 52, 146 N.E.3d 285. Additionally, review of such issues is guided by the following legal principles:

> "When interpreting a statute, the court's primary objective is to ascertain and give effect to the intent of the legislature. [Citation.] The most reliable indicator of legislative intent is the language of the statute itself, which must be given its plain and ordinary meaning. [Citation.] We consider the statute in its entirety,

keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it. [Citation.] Words and phrases should not be construed in isolation but must be interpreted in light of other relevant provisions of the statute. [Citation.] No part of a statute should be rendered meaningless or superfluous. [Citation.] Clear and unambiguous language will be applied as written. [Citation.] In addition, specific statutory provisions will control over general provisions on the same subject. [Citation.] *** Moreover, courts will presume that the legislature did not intend to enact a statute that leads to absurdity, inconvenience, or injustice. [Citation.]" *Van Dyke v. White*, 2019 IL 121452, ¶ 46, 131 N.E.3d 511.

¶ 64        The Act, which was enacted by the legislature in 1981, "is a 'right-to-farm' law." *Toftoy v. Rosenwinkel*, 2012 IL 113569, ¶ 15, 983 N.E.2d 463. With some variation, "such laws exist in all 50 states." *Id.* Section 1 of the Act sets forth its purpose, stating as follows:

"It is the declared policy of the state to conserve and protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products. When nonagricultural land uses extend into agricultural areas, farms often become the subject of nuisance suits. As a result, farms are sometimes forced to cease operations. Many others are discouraged from making investments in farm improvements. It is the purpose of this Act to reduce the loss to the State of its agricultural resources by limiting the circumstances under which farming operations may be deemed to be a nuisance." 740 ILCS 70/1 (West 2014).

Section 2 of the Act defines the term "farm," as "any parcel of land used for the growing and

- 25 -

harvesting of crops; for the feeding, breeding and management of livestock; for dairying or for any other agricultural or horticultural use or combination thereof." *Id.* § 2.

¶ 65        "Section 3 of the Act bars certain nuisance lawsuits." *Toftoy*, 2012 IL 113569, ¶ 20. That section states as follows:

> "No farm or any of its appurtenances shall be or become a private or public nuisance because of any changed conditions in the surrounding area occurring after the farm has been in operation for more than one year, when such farm was not a nuisance at the time it began operation, provided, that the provisions of this Section shall not apply whenever a nuisance results from the negligent or improper operation of any farm or its appurtenances." 740 ILCS 70/3 (West 2014).

"At common law, a plaintiff who came to the nuisance would not be barred from pursuing a nuisance action, but the fact that the land was acquired or improved after the nuisance generating activity began would be a factor in determining whether the nuisance was actionable." *Toftoy*, 2012 IL 113569, ¶ 18. However, "section 3 codifies, and makes a bar to suit, the entirety of the coming to the nuisance doctrine." *Id.* ¶ 21; see also *Guth v. Tazewell County*, 698 F.3d 580, 584 (7th Cir. 2012) (stating section 3 of the Act "insulat[es] farmers against nuisance suits after a farm has been in operation for a year—but with exceptions"). "By reducing the incidence of nuisance suits, section 3 of the Act is intended to reduce the cost of farming and help prevent the loss of farmland." *Toftoy*, 2012 IL 113569, ¶ 15.

¶ 66        Finally, relevant to this appeal is the fee-shifting provision of section 4.5 of the Act (740 ILCS 70/4.5 (West 2014)). That section states as follows:

> "In any nuisance action in which a farming operation is alleged to be a nuisance, a

prevailing defendant shall recover the aggregate amount of costs and expenses determined by the court to have been reasonably incurred in the defense of the nuisance action, together with a reasonable amount for attorney fees. For the purposes of this Section, a prevailing defendant is a defendant in a lawsuit in whose favor a final court order or judgment is rendered." *Id.*

¶ 67 In this instance, we agree with defendants that the plain language of the Act, specifically section 4.5, applies to the present case and that the trial court erred in determining otherwise. As indicated above, section 4.5 is applicable in "any nuisance action" where a defendant farming operation is alleged to be a nuisance and then prevails in the action. There is no dispute that defendants' hog farming operation constituted a "farming operation" under the Act. Instead, the first basis for the court's denial of attorney fees was its finding that the parties' fact situation did not come within the protection of the Act because "the case at bar [did] not pit non[ ]agricultural interests against agricultural interests."

¶ 68 As argued by defendants, we find no requirement in the Act's plain language that requires the plaintiffs in a nuisance suit against a farming operation to have purely nonagricultural interests for the Act to apply. Although the purpose section of the Act generally references the extension of nonagricultural land uses into agricultural areas as a precipitating factor of nuisance suits, the clear and explicit "purpose" was identified as "reduc[ing] the loss to the State of its agricultural resources by limiting the circumstances under which farming operations may be deemed to be a nuisance." *Id.* § 1; see *Toftoy*, 2012 IL 113569, ¶¶ 15-19 (broadly interpreting section 3 of the Act and holding it was "intended to reduce the cost of farming and help prevent the loss of farmland"). The legislature's clearly stated purpose focuses on those individuals and

entities against whom the nuisance action is brought, rather than those bringing the suit, and the trial court's interpretation of the Act would do little to further its stated purpose. Moreover, section 4.5 itself uses very broad language, applying to "any nuisance action" against a farming operation. There exists no exclusion in section 4.5, or any other provision of the Act, for nuisance actions brought by plaintiffs who themselves have "agricultural interests." See *Zink v. Khwaja*, 2000 WI App 58, ¶¶ 14-16, 233 Wis. 2d 691, 608 N.W.2d 394 (rejecting the same argument regarding a "farmer-plaintiff exception" in the context of a similar statute).

¶ 69        As a second basis for denying defendants' motion for attorney fees, the trial court found that section 3 of the Act contained an "exemption of application of the [A]ct to actions alleging negligent or improper operation of any farm." It then characterized defendants as having prevailed in a negligence action and, thus, being unable to avail themselves of section 4.5's fee-shifting provisions. Again, we disagree with the court's interpretation.

¶ 70        As discussed, section 4.5 applies "[i]n *any* nuisance action in which a farming operation is alleged to be a nuisance" and the farming operation defendant then prevails. (Emphasis added.) 740 ILCS 70/4.5 (West 2014). Here, although plaintiffs raised claims of negligence against defendants, those claims were brought within the context of a "nuisance action." See *Chicago Flood Litigation*, 176 Ill. 2d at 204 (A "private nuisance is a substantial invasion of another's interest" and requires an invasion that must be "substantial, either *intentional or negligent*, and unreasonable." (Emphasis added.)). The record reflects plaintiffs defined and argued their action as one sounding in nuisance. The jury was instructed on applicable nuisance law. Further, even on appeal, plaintiffs identify the underlying action as arising from "complaints of negligence and nuisance."

- 28 -

¶ 71    Further, as stated, section 3 of the Act insulates a defendant farming operation from nuisance suits, but contains an exception for when the nuisance is alleged to have resulted from "the negligent or improper operation of any farm or its appurtenances." 740 ILCS 70/3 (West 2014). By its own terms, the negligence exception in section 3 applies to only that section and its complete bar of nuisance actions, not the entire Act. See *id.* (stating "the provisions of this Section shall not apply whenever a nuisance results from the negligent or improper operation of any farm or its appurtenances").

¶ 72    On appeal, plaintiffs argue that because the fee-shifting provisions of section 4.5 are in derogation of the common law rule that parties to litigation bear their own fees and costs, this court may not liberally interpret the phrase "nuisance action" as it is used in section 4.5. See *State ex rel. Schad, Diamond & Shedden, P.C. v. My Pillow, Inc.*, 2018 IL 122487, ¶ 18, 115 N.E.3d 923 ("Because they are in derogation of the common law, statutes *** that allow for fee awards must be strictly construed."). They assert that "[t]he meaning of 'nuisance action' cannot also mean negligence action without construing the term beyond its narrow meaning and introducing ambiguity."

¶ 73    We disagree and find plaintiffs ignore critical language in the case authority they rely upon. Specifically, plaintiffs cite the supreme court's decision in *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 69, 809 N.E.2d 1248, 1271 (2004), for the following propositions of law:

> "[A] court cannot construe a statute in derogation of the common law *beyond what the words of the statute expresses* or beyond what is necessarily implied from what is expressed. In construing statutes in derogation of the common law, a court will not presume that an innovation thereon was intended further *than the innovation*

- 29 -

*which the statute specifies or clearly implies*. [Citations.] Illinois courts have limited all manner of statutes in derogation of the common law *to their express language*, in order to effect the least—rather than the most—change in the common law." (Emphases added.)

In this case, limiting section 4.5 to its express language, it broadly applies to *any* nuisance action without exclusion. We can imagine no broader interpretation of this language than what is already contained within the plain and explicit language of the statute itself. In other words, the statutory language of section 4.5 gives "nuisance action" a broad application and not the narrow one advocated by plaintiffs.

¶ 74     Here, the trial court read exceptions into the Act that are not present in its plain and unambiguous language. Applying the plain language of the Act, we find section 4.5 applies to the present case, in that plaintiffs brought a nuisance action against defendants, who operated a hog farming operation, alleging it to be a nuisance. Defendants prevailed in the action and are, therefore, entitled to "recover the aggregate amount of costs and expenses determined by the court to have been reasonably incurred in the defense of the nuisance action, together with a reasonable amount for attorney fees." 740 ILCS 70/4.5 (West 2014).

¶ 75                    2. *Constitutionality of Section 4.5 of the Act*

¶ 76     On appeal, plaintiffs argue that defendants' interpretation of section 4.5 of the Act is unconstitutional. Specifically, they contend that section 4.5, as interpreted by defendants, violates the Illinois Constitution's protection against special legislation (Ill. Const. 1970, art. IV, § 13) and its equal protection clause (Ill. Const. 1970, art. I, § 12). They claim their interests in the use and enjoyment of their properties are a fundamental right, requiring a strict-scrutiny analysis

of section 4.5. Finally, plaintiffs contend defendants' interpretation of section 4.5 runs afoul of the separation of powers clause (Ill. Const. 1970, art. II, § 1).

¶ 77                                    a. Standard of Review

¶ 78          "The constitutionality of a statute is a question of law subject to *de novo* review." *Piccioli v. Board of Trustees of Teachers' Retirement System*, 2019 IL 122905, ¶ 17, 137 N.E.3d 745. "Statutes carry a strong presumption of constitutionality" and "[i]t is this court's duty to uphold the constitutionality of a statute if reasonably possible." *Id.* The party alleging the unconstitutionality of a statute "bear[s] the burden of establishing the statute's constitutional infirmity." *Id.*

¶ 79                                    b. Timeliness of Notice

¶ 80          Initially, defendants argue that this court need not reach plaintiffs' constitutionality claims because plaintiffs failed to give timely notice of those claims to the Illinois Attorney General pursuant to Illinois Supreme Court Rule 19 (eff. Sept. 1, 2006). Specifically, defendants assert they filed affirmative defenses in September 2011 and December 2013, which put plaintiffs on notice of their intention to claim an entitlement to attorney fees pursuant to section 4.5. Defendants further argue that because plaintiffs did not notify the Attorney General of their constitutional arguments until June 2016, they have waived those arguments.

¶ 81          Illinois Supreme Court Rule 19(a) (eff. Sept. 1, 2006) requires parties that challenge the constitutionality of a statute to provide notice of their challenge to the Attorney General. "The notice shall be served at the time of suit, answer or counterclaim, if the challenge is raised at that level, or promptly after the constitutional *** question arises as a result of a circuit or reviewing court ruling or judgment." Ill. S. Ct. R. 19(b) (eff. Sept. 1, 2006). A party's failure to comply with

- 31 -

Rule 19 "results in waiver of the constitutional issue." *Villareal v. Peebles*, 299 Ill. App. 3d 556, 560, 701 N.E.2d 145, 148 (1998).

¶ 82        Further, the determination of whether there was prompt notification, turns on "when the constitutional question arose." *Id.* "To have standing to challenge the constitutionality of a statute, one must have sustained or *be in immediate danger* of sustaining a direct injury as a result of enforcement of the challenged statute." (Emphasis in original.) *Id.* (citing *Messenger v. Edgar*, 157 Ill. 2d 162, 623 N.E.2d 310, 314 (1993)).

¶ 83        Here, although defendants raised the possibility of a section 4.5 claim for fees and costs early in the parties' litigation, plaintiffs were not in "immediate danger" of sustaining an injury as a result of the enforcement of section 4.5 until defendants prevailed in the underlying litigation on May 24, 2016, and after defendants filed their motion for attorney fees on June 10, 2016. Plaintiffs' notice of a claim of unconstitutionality was given shortly following those events. Accordingly, we find it was "promptly" given within the meaning of Rule 19.

¶ 84                        c. Special Legislation Clause

¶ 85        The special legislation clause of the Illinois Constitution provides as follows:

> "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13.

The clause "prohibits the General Assembly from conferring a special benefit or privilege upon one person or group and excluding others that are similarly situated." (Internal quotation marks omitted.) *Piccioli*, 2019 IL 122905, ¶ 18. To determine whether a law constitutes special

legislation, a court must determine (1) "whether the statutory classification at issue discriminates in favor of a select group and against a similarly situated group" and (2) "if the classification does so discriminate, *** whether the classification is arbitrary." *Id.*

¶ 86    First, "laws will not be regarded as improper special legislation merely because they affect only one class of entities and not another." *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 236, 840 N.E.2d 1174, 1183 (2005). Instead, to contravene the special legislation clause, "the statute must confer on a person, entity, or class of persons or entities a special benefit or exclusive privilege that is denied to others who are similarly situated." *Id.*

¶ 87    Here, plaintiffs have failed to meet their burden of establishing that section 4.5 of the Act discriminates in favor of a select group and against a similarly situated group. On appeal, they argue that "similarly situated [p]laintiffs with actions against farms are arbitrarily categorized differently," in that plaintiffs who bring unsuccessful negligence or trespass suits against a farm are treated differently from plaintiffs who bring unsuccessful nuisance suits. However, as stated, it is not enough that a law affects only one class of individuals and not another, and the proper consideration is whether a class of persons is receiving a special benefit or privilege to the arbitrary exclusion of similarly situated individuals. In this instance, plaintiffs focus on the wrong group for comparison.

¶ 88    Section 4.5 of the Act clearly confers a benefit to defendant farmers or farming operations that successfully defend a nuisance action by permitting them to obtain an award of attorney fees. The appropriate inquiry, then, is whether individuals or entities who are similarly situated to prevailing defendant farmers or farming operations in a nuisance suit—the class receiving the benefit—are being arbitrarily excluded. Here, plaintiffs have failed to identify any

- 33 -

similarly situated group comparable to the subject class, an omission that is fatal to their constitutional claim. See *Austin Highlands Development Co. v. Midwest Insurance Agency, Inc.*, 2020 IL App (1st) 191125, ¶ 29 (finding the party challenging a statute as unconstitutional special legislation failed to meet their burden and "[c]ritically" failed to identify "a comparable group that does not receive the alleged special protection").

¶ 89        Second, assuming *arguendo* that plaintiffs presented a sufficient argument to establish that section 4.5 discriminates in favor of a select group and against a similarly situated group, they have also failed to meet the remainder of their burden for establishing unconstitutional special legislation—that the discriminatory classification is arbitrary. "Whether a classification is arbitrary is generally determined under the same standards that are applicable to an equal protection challenge." *Piccioli*, 2019 IL 122905, ¶ 20. Accordingly, "[w]here *** a statute does not affect fundamental rights, we use the rational basis test to assess its constitutionality." *Id.* "Under this test, we ask whether the statutory classification is rationally related to a legitimate state interest." *Id.* Conversely, "if the statute infringes upon a fundamental right, then the statute must withstand strict scrutiny and will only survive if it is necessary to promote a compelling state interest and narrowly tailored to effectuate that state interest." *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 81, 991 N.E.2d 745.

¶ 90        Plaintiffs argue "that the enjoyment of property is a fundamental right" and section 4.5 of the Act violates their rights to the "use and enjoyment of their property." They contend section 4.5 "impinges on the exertion of the right to use and enjoy property because it serves to discourage even meritorious suits seeking remedy for interference with the right to use and enjoy property." Accordingly, they contend a strict scrutiny analysis applies. We disagree.

¶ 91        Although plaintiffs strongly assert that they have a fundamental right to the use and enjoyment of their property, they cite no case authority wherein such a fundamental right was found and strict scrutiny was applied. Ultimately, we do not find that relevant case authority supports their position. See *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 308-09, 891 N.E.2d 839, 847 (2008) (holding that although "the privilege to use one's property in his own way and for his own purposes is both a liberty and a property right," the property rights alleged to be infringed by the enactment of zoning code amendments were not fundamental rights and strict scrutiny was inapplicable); *Petterson v. City of Naperville*, 9 Ill. 2d 233, 247, 137 N.E.2d 371, 379 (1956) ("The privilege of the individual to use his property as he pleases is subject always to a legitimate exercise of the police power under which new burdens may be imposed upon property and new restrictions placed upon its use when the public welfare demands."); *Beeding v. Miller*, 167 Ill. App. 3d 128, 141, 520 N.E.2d 1058, 1067 (1988) ("[A] property owner's right to use his property as he chooses is subordinate to the State's right to regulate that use for the protection of the general welfare.").

¶ 92        Additionally, we find the Illinois case authority relied upon by defendants speaks to the circumstances presented here. In *Shachter v. City of Chicago*, 2011 IL App (1st) 103582, ¶ 97, 962 N.E.2d 586, the First District rejected the plaintiffs' contention that strict scrutiny applied to his constitutional claim that a weed ordinance interfered with *his right to use his property*. Plaintiffs dismiss this case on the basis that it involved the exercise of the State's police powers. However, "police power" refers to "the attribute of sovereignty in every government by which it may protect lives, health, morals and general welfare." *Sherman-Reynolds, Inc. v. Mahin*, 47 Ill. 2d 323, 326, 265 N.E.2d 640, 642 (1970). "The police power relates not merely to the public health and to public physical safety, but also to public financial safety." (Internal quotation marks

omitted.) *Id.*; *Zelney v. Murphy*, 387 Ill. 492, 499, 56 N.E.2d 754, 758 (1944) ("Legislation under the police power of the State is not confined to public health, safety or morality, but may extend to matters in the interest of the public welfare or convenience."). Plaintiffs present no explanation or argument on appeal as to why section 4.5 of the Act would fall outside of the bounds of the State's "police power" and the legislature's ability to enact regulations in the interest of the public welfare. This omission is particularly apparent in light of "the declared policy of the state to conserve and protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products." 740 ILCS 70/1 (West 2014).

¶ 93        Further, in *Marks v. Vanderventer*, 2015 IL 116226, ¶ 1, 39 N.E.3d 915, the supreme court considered the constitutionality of a $10 surcharge that was collected "for the recordation of any real estate-related document in a county." In doing so, it rejected the plaintiffs' contention "that the statutory surcharge implicate[d] a fundamental right because property interests [were] involved." *Id.* ¶ 26. The court noted the plaintiffs cited no case authority to support their assertion *and* that "the case law [was] to the contrary." *Id.* In particular, it cited *Estate of Cowser v. Commissioner of Internal Revenue*, 736 F.2d 1168, 1173 n.3 (7th Cir. 1984), for the proposition that "[m]any laws have indirect but nonetheless potentially significant effects on property" and "[s]uch indirect effects do not subject them to strict scrutiny." (Internal quotation marks omitted.) *Marks*, 2015 IL 116226, ¶ 26. Accordingly, the court applied "rational basis review." *Id.*

¶ 94        As discussed, section 4.5 of the Act is a fee-shifting statute. It requires that plaintiffs, whose nuisance claims against a farm or farming operation have been unsuccessful, pay the prevailing defendant's reasonable litigation costs and expenses. To the extent section 4.5 has any effect on a nuisance plaintiff's use and enjoyment of his property, the effects are indirect. We

decline to apply a strict scrutiny analysis in this case.

¶ 95        In applying the rational basis test, we consider "whether the statutory classification is rationally related to a legitimate state interest." *Piccioli*, 2019 IL 122905, ¶ 20. In the Act, the legislature declared that it was state policy "to conserve and protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products" and that the purpose of the act was "to reduce the loss to the State of its agricultural resources by limiting the circumstances under which farming operations may be deemed to be a nuisance." 740 ILCS 70/1 (West 2014). Plaintiffs do not dispute that these are legitimate state interests.

¶ 96        Further, we find section 4.5 is rationally related to the asserted state interests by creating a disincentive for the filing of nuisance lawsuits that are without merit or which have a low probability of success. In particular, legislative history relevant to the passage of section 4.5 as an amendment to the Act reflects the following:

> "This Amendment *** provides that the prevailing defendant in a farm nuisance action shall be awarded reasonable attorney fees, costs and expenses. The Farm Nuisance Suit Act was enacted by this General Assembly *** in 1981. This has served the agricultural community very well. I think that this Amendment is necessary so that *we can do away with frivolous law suits [sic] that do hinder agriculture*, especially those that are involved in the livestock industry." (Emphasis added.) See 89th Ill. Gen. Assem., House Proceedings, April 25, 1995, at 3 (statements of Representative Lawfer).

Section 4.5 has the arguable effect of reducing nuisance lawsuits and, thereby, reducing costs to

- 37 -

farmers in defending such litigation and assisting with the conservation of Illinois's agricultural resources. See *Toftoy*, 2012 IL 113569, ¶ 15 (equating reductions in the incidence of nuisance suits with reductions in the cost of farming and preventing the loss of farmland). Accordingly, we find section 4.5 is not arbitrary and does not violate the special legislation clause of the Illinois Constitution.

¶ 97                                    d. Equal Protection Clause

¶ 98            In their notice of a claim of unconstitutionality to the Illinois Attorney General, plaintiffs also alleged section 4.5 of the Act is unconstitutional on equal protection grounds.

¶ 99            "When evaluating equal protection claims, this court uses the same standards for both the United States and Illinois Constitutions." *In re Destiny P.*, 2017 IL 120796, ¶ 14, 102 N.E.3d 149. "The equal protection clause guarantees that similarly situated individuals will be treated in a similar fashion unless the government can demonstrate an appropriate reason to treat them differently." *Id.* As stated above, the same standards apply when evaluating a constitutional challenge to a statute based on claims that it is impermissible special legislation and that it violates the equal protection clause. *Piccioli*, 2019 IL 122905, ¶ 20. Consequently, to the extent plaintiffs argue on appeal that section 4.5 of the Act violates the equal protection clause, their challenge must fail for the same reasons they have failed to establish a violation of the special legislation clause.

¶ 100                                   e. Separation of Powers

¶ 101            Finally, plaintiffs argue the fee-shifting provisions of section 4.5 of the Act violate the separation of powers clause of the Illinois Constitution. That clause provides: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging

to another." Ill. Const. 1970, art. II, § 1.

¶ 102     "[T]he purpose of the [separation of powers] provision is to ensure that the whole power of two or more branches of government shall not reside in the same hands." *In re Derrico G.*, 2014 IL 114463, ¶ 75, 15 N.E.3d 457. It "was not designed to achieve a complete divorce among the three branches of our system of government; nor does it prescribe a division of governmental powers into rigid, mutually exclusive compartments." *Id.* ¶ 76. The three branches of government have "shared or overlapping powers." (Internal quotation marks omitted.) *Id.* Judicial powers have been construed as including "the adjudication and application of law [citation] and the procedural administration of the courts." *People v. Bainter*, 126 Ill. 2d 292, 303, 533 N.E.2d 1066, 1070 (1989). "The legislature, in turn, is vested with the power to enact laws." *Id.* However, it may not "enact laws that unduly infringe upon the inherent powers of the judiciary." *Id.*

¶ 103     Plaintiffs argue that the fee-shifting requirement of section 4.5 "strips the courts of discretion in an area that is normally reserved for the judiciary and not the legislature." However, as noted by defendants, fee-shifting provisions like the one in section 4.5 are not unique. Significantly, plaintiffs cite no authority that such provisions impermissibly encroach on the power of the judiciary. Further, we note the supreme court has held that "Illinois follows the 'American rule,' which prohibits prevailing parties from recovering their attorney fees from the losing party, *absent* express statutory or contractual provisions." (Emphasis added.) *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 64, 962 N.E.2d 418; see also *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 519, 732 N.E.2d 528, 543 (2000) ("[T]he legislature has the inherent authority to repeal or change the common law and may do away with all or part of it."). Such authority

explicitly contemplates the challenged legislative action in this case.

¶ 104    As stated, statutes carry a strong presumption of constitutionality. In this case, plaintiffs have not carried their burden of establishing that section 4.5 is constitutionally infirm.

¶ 105    III. CONCLUSION

¶ 106    For the reasons stated, we reverse the trial court's denial of defendants' motion for reasonable attorney fees pursuant to section 4.5 of the Act and remand with directions that the court grant the motion and enter an appropriate fee award. We otherwise affirm the court's judgment.

¶ 107    Affirmed in part and reversed in part.
¶ 108    Cause remanded with directions.

**No. 4-19-0314**

| | |
|---|---|
| **Cite as:** | *Marsh v. Sandstone North, LLC*, 2020 IL App (4th) 190314 |
| **Decision Under Review:** | Appeal from the Circuit Court of Scott County, No. 10-L-3; the Hon. David R. Cherry, Judge, presiding. |
| **Attorneys for Appellant:** | Ralph Davis, of Peoria, for appellants. |
| **Attorneys for Appellee:** | Stephen R. Kaufmann, Jennifer M. Martin, and Charles N. Insler, of HeplerBroom, LLC, of Springfield, and Eldon L. McAfee and Julia L. Vyskocil, of Brick Gentry, P.C., of West Des Moines, Iowa, for appellees. |
| *Amicus Curiae*: | Claire A. Manning and Anthony D. Schuering, of Brown, Hay & Stephens, LLP, of Springfield, for *amicus curiae* Illinois Pork Producers Association. |
| | Laura A. Harmon and Garrett W. Thalgott, of Illinois Agricultural Association, of Bloomington, *amicus curiae*. |